11 CV 0039

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| ANGUS PARTNERS LLC d/b/a Angus Energy and WHITE CRANE MARTIAL ARTS, INC., individually and on behalf of all others similarly situated, | : |
| Plaintiffs, | : |
| v. | : **COMPLAINT** |
| | : No. |
| JAY WALDER, individually and in his official capacity, JAMES FERRARA, individually and in his official capacity, METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY d/b/a METROPOLITAN TRANSPORTATION AUTHORITY BRIDGES & TUNNELS, | : |
| Defendants. | : |

Plaintiffs, by their attorneys, the Bromberg Law Office, P.C., and the Law Office of Harley Schnall, as and for their Complaint against Defendants, allege as follows:

### NATURE OF CASE

1.      This is a civil rights class action, brought by plaintiffs Angus Partners, LLC and White Crane Martial Arts, Inc. ("Plaintiffs"), on behalf of themselves and all others similarly situated, arising from the levels at which defendants Jay Walder, James Ferrara, Metropolitan Transportation Authority ("MTA") and

Triborough Bridge and Tunnel Authority ("TBTA," "MTA Bridges and Tunnels" or "MTAB&T") (collectively, "Defendants"), have set toll rates for facilities crossing bodies of water within the confines of New York City under their management and control, and for the practice under which revenues from those tolls are diverted to fund operations, projects and initiatives unrelated to those facilities.

2.      As set forth below in more detail, Plaintiffs allege the excessive and unreasonable toll pricing violates the right to travel in the United States Constitution and certain provisions therein, including  Art. I, § 8, Cl. 3 ("the Commerce Clause"), Art. IV, § 2, Cl. 1 ("the Privileges and Immunities Clause"), and Amend. XIV, § 1 ("the Privileges or Immunities Clause" and "the Equal Protection Clause"), and thereby is actionable under 42 U.S.C. § 1983, and has led Defendants to be unjustly enriched to the detriment of Plaintiffs and the other members of the Class.

## JURISDICTION

3.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, and 1343 because this action is filed to obtain injunctive and compensatory relief for the deprivation, under color of state law, of the rights of citizens of the United States secured by the United States Constitution and federal law under 42 U.S.C. § 1983.  This Court also has jurisdiction over this action under the provisions of 28 U.S.C. § 2201 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(c) because Defendants are subject to personal jurisdiction in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and because Defendant MTAB&T has its principal place of business within this District.

## THE PARTIES

5.      Plaintiff Angus Partners, LLC is a Florida corporation doing business as Angus Energy that, in the course of engaging in interstate commerce, used TBTA facilities and paid tolls at the base automobile rate on a number of occasions during the relevant alleged class period and continues to use those facilities in the course of engaging in interstate commerce.  Such usage of the facilities represented interstate commerce and interstate travel because, *inter alia*, it constituted a portion of employee business trips through the mid-Atlantic region.

6.      Plaintiff White Crane Martial Arts, Inc. is a New York corporation that, in the course of engaging in interstate commerce, used TBTA facilities and paid tolls at the base automobile rate on a number of occasions during the relevant alleged class period and continues to use those facilities in the course of engaging in interstate commerce.

7.      Defendant MTA was and is a public benefit corporation organized and existing under and by virtue of a charter by New York State ("State").

8.      Defendant MTA consists of several constituent and subsidiary agencies, including New York City Transit ("NYCT"), Long Island Railroad

3

("LIRR"), Metro-North Railroad ("MNR"), Long Island Bus ("LIB") and defendant TBTA.

9.      The TBTA was made part of the MTA in 1968.

10.      The TBTA and NYCT remain operationally and legally independent from one another and from the MTA.

11.      The TBTA remains operationally and legally independent from LIRR, MNR and LIB.

12.      Through its constituent agencies, the MTA controls, operates and/or owns a variety of transportation facilities in a 12-county region of southeastern New York State, encompassing the five boroughs of New York City, two counties of Long Island and five counties in and around the lower Hudson Valley.

13.      The MTA system of bus and rail operations includes approximately 3,924 bus route miles and 2,047 track miles.

14.      The TBTA's seven bridges and two tunnels constitute approximately 20 route miles of water crossings forming connections between the boroughs of New York City, with the exception of the Cross Bay Veterans Memorial Bridge, which connects one part of Queens with another part of that borough.

15.      The TBTA's water crossings traverse the East River, Harlem River, Bronx Kill (the body of water connecting the East River and Harlem River), New York Bay, Jamaica Bay and the Rockaway Inlet.

16.      The principal place of business of the MTA and the TBTA is 347 Madison Avenue, New York, New York.

17.     The MTA and the TBTA are neither the "alter egos" nor the "arms" of the State of New York, and they and their respective executives and officers have no sovereign immunity under the Eleventh Amendment.

18.     Defendant Jay H. Walder is the Chairman and Chief Executive Officer of the MTA.

19.     Walder sets, directs, and continues the policies and actions of the MTA and TBTA, and is a policy maker with respect to the conduct alleged herein.

20.     Defendant James Ferrara is the Acting President of the TBTA.

21.     Ferrara sets, directs, and continues the policies and actions of the TBTA, and is a policy maker with respect to the conduct alleged herein.

## ALLEGATIONS

22.     The Commerce Clause of the United States Constitution (Article I, § 8, cl. 3) ("Commerce Clause") prohibits states and their agencies from discriminating against or unduly burdening the flow of interstate commerce through unreasonable or excessive tolls, tariffs or taxation schemes.

23.     Similarly, the constitutional right to travel interstate and intrastate, located implicitly within the U.S. Constitution in the Privileges or Immunities Clause or the Equal Protection Clause (Amendment XIV, § 1), the Privileges and Immunities Clause (Article IV) or the Commerce Clause, prohibits states and their agencies from engaging in a practice that actually deters such travel, that seeks to impede travel as its primary objective, or that uses any classification which serves to penalize the exercise of that right.

24.     During the Class Period as defined below, and continuing today, Defendants have implemented and/or maintained policies setting rates for tolls on TBTA facilities that annually yielded operating surpluses of hundreds of millions of dollars.

25.     Under the Public Authorities Law of the State of New York, TBTA operating surpluses may be (i) used to pay debt service costs for the MTA and certain of its other constituent agencies and (ii) transferred to the MTA for redistribution to certain of MTA's other constituent agencies in accordance with a prescribed formula. See P.A.L. § 1219-a(2)(b).

26.     Under color of that authority, Defendants unlawfully used, and continue to use, a large portion of those operating surpluses (hereafter "TBTA Surplus Funds") for "inter-agency subsidies" or other funding mechanisms,  to directly or indirectly underwrite or subsidize capital projects, operations and initiatives not functionally related to the TBTA tolled water crossing facilities and of no benefit to motorists with respect to their use of those facilities, including, but not limited, to those described below.

27.     The fares, tolls and pricing policies referred to below as "2010 pricing policies" were those in effect for most of calendar 2010, immediately before increases were scheduled to be implemented on December 30, 2010; Defendants' pricing and other policies have been, and continue to be, unlawful.

**Student Transportation**

28.     The MTA directly or indirectly uses TBTA Surplus Funds to underwrite the Student Metrocard program, which subsidizes the transportation of approximately 500,000 primary and secondary school students in New York City ("City") on NYCT buses and subways.

29.     Under New York law, the transportation of students to and from their primary and secondary schools is an educational expense. See N.Y. Education Law § 3635.

30.     Defendants administer the Student Metrocard program in conjunction with the Office of Pupil Transportation in the New York City Board of Education.

31.     Prior to 1994, the City subsidized the predecessor student transportation program to the Student Metrocard program, which furnished students with "flash card" transit passes.

32.     In October 1994, City Mayor Rudy Giuliani suspended the City subsidy for student transit passes, which then amounted to $128 million per year, $69 million of which the State reimbursed the City.

33.     In 1995, the MTA, the City and the State entered into a three-way financing arrangement whereby the City and the State would each contribute $45 million to subsidize the student transportation program, with the MTA assuming the remaining third of the then-estimated $135 million cost of the program.

34.     Over the next 14 years, while the State's and City's contributions to the student transportation program remained fixed at approximately $45 million

each, the cost of the program rose steadily each year, to an MTA-estimated $179 million for the 2008-09 school year, and thus Defendants' subsidy increased accordingly.

35.    In November 2009, the State reduced its contribution, providing only $6 million to the program that, by MTA estimates, cost $214 million.

36.    In December 2009, facing a budget gap of several hundred million dollars, Defendants Walder and MTA prepared budget plans to phase out the Student Metrocard program, asserting that "MTA can no longer afford to subsidize this free service." See "Staff Summary," p. 5, from "MTA 2010 Budget December Financial Plan 2010-2013" in MTA's 2009 Budget documents, mta.info/mta/budget/pdf/dec09_staff_summary.pdf, last retrieved on August 4, 2010.

37.    On March 17, 2010, Walder stated, "I wish I could commit to fund this program, but the MTA simply does not have the money to cover this State and City responsibility any longer." See mta.info/news/stories/?story=34, "Chairman Walder Meets with Students," March 18, 2010, last retrieved on July 2, 2010.

38.    On or about June 18, 2010, MTA and the State reached an agreement whereby the MTA would continue the Student Metrocard program and the State would restore its annual contribution to the program to the level of $25 million.

39.    In his remarks at the June 23, 2010 MTA Board Meeting, Walder stated

> . . . this Board had adopted a position that we had hoped that the State and the City would pay the total cost of the Metrocard program, the student Metrocard program, with the view that this is really a responsibility of others to be able to do it and we're the service provider

> in doing it.  I think the issue, however, was something that came up
> very loud and clear in our public hearings. . . . that if we were to
> change this program, if we were to take away the free student
> Metrocards, that this is a life-changing event in the City, and I think it
> would impact on the ability of New York City school students to have
> the education that they deserve and to have the opportunity to attend
> the best schools in the City without constraint of the transportation
> system. In light of those impacts, we have decided to abandon the
> proposal to charge students to travel to and from school.

See "06/23/10 Board Meeting" in "Archived Public Meeting Webcasts,"

mta.info/mta/webcasts/archive.htm, last retrieved June 28, 2010.

40.    Student Metrocards were and are provided only to eligible students

who are City residents.

41.    City nonresidents were and are not eligible for the Student Metrocard

program.

42.    Despite their acknowledgement that the Student Metrocard program

constitutes an educational expense that should be borne not by the MTA or its

constituent agencies but by the State and/or the City, Defendants have subsidized

and continue to subsidize this program, directly or indirectly, with TBTA Surplus

Funds.

43.    The Student Metrocard program is not functionally related to TBTA's

water-crossing facilities for motor vehicles.

**Long Island Bus ("LIB")**

44.     In 1973, MTA created the Metropolitan Suburban Bus Authority ("MSBA") by combining the operations of ten privately-chartered bus companies in Nassau County.

45.     The MTA entered then into an agreement with Nassau County to operate local bus service in Nassau County through the MSBA.

46.     The MSBA is now commonly known as MTA Long Island Bus or simply Long Island Bus ("LIB"), and is a constituent agency and operating subsidiary of the MTA.

47.     Nassau County owns all of LIB's assets and, according to the MTA, is responsible for funding its operations.

48.     LIB primarily provides Nassau County local bus service.

49.     LIB does not provide service for customer trips wholly within New York City.

50.     Under the 2010 pricing policies of MTA and LIB, the base fare for LIB passengers is $2.25, and there is a provision for free LIB-to-NYCT-bus and LIB-to-NYCT-subway transfer.

51.     The MTA directly or indirectly subsidizes LIB operations with millions of dollars of TBTA Surplus Funds annually, much of which funds unmet financial obligations of Nassau County government to support LIB.

52.     In its 2011 Preliminary Budget and Four Year Financial Plan released in July 2010, the MTA proposed to eliminate at least a portion of this subsidization,

because it "can no longer afford to subsidize this service, which would cost the MTA more than $25 million in 2011." See "MTA 2011 Preliminary Budget July Financial Plan 2011-2014," Volume 1, p. I-8,  mta.info/mta/budget/july2010/july2010_vol1.pdf, last retrieved on August 4, 2010.

53.     In Defendant Walder's own words, "Nassau County has an obligation to fund bus service in Nassau County, the same way every other suburban county has an obligation." See http://www.newsday.com/long-island/nassau/mta-board-eliminates-subsidy-for-li-bus-1.2544817, last visited on December 26, 2010.

54.     Despite their acknowledgement that LIB operations constitute an expense that should be borne not by the MTA or its constituent agencies but by Nassau County, Defendants have subsidized and continue to subsidize this program with TBTA Surplus Funds.

55.     LIB service is not functionally related to TBTA's water-crossing facilities for motor vehicles.

**New York City Transit (NYCT)**

56.     NYCT, a constituent agency and subsidiary of Defendant MTA, operates subway service in four of New York City's five boroughs – Bronx, Brooklyn, Manhattan and Queens; rail service in the fifth borough, Staten Island, through its Staten Island Railway subsidiary ("SIR"); and local bus service in all five boroughs of New York City.

57.     Under the pricing policies of MTA and its constituent agency NYCT in August 1981, the base fare for subway passengers was $0.75.

58.     Under the pricing policies of MTA and its constituent agency NYCT in August 1981, the base fare for local bus passengers was $0.75.

59.     Under the pricing policies of MTA and its constituent agency NYCT in August 1981, there was no provision for free bus-to-subway transfer, so a trip involving a local bus ride and a subway ride cost $1.50.

60.     Under the pricing policies of Defendants in August 1981, the base one-way toll for the so-called major TBTA facilities ("Major Crossings"), including the Bronx-Whitestone Bridge, the Brooklyn-Battery Tunnel, the Queens-Midtown Tunnel, the Robert F. Kennedy Bridge (then known as the Triborough Bridge), the Throgs Neck Bridge, and the Verrazano Narrows Bridge, was $1.00 for passenger vehicles.

61.     Under the 2010 pricing policies of Defendant MTA and its constituent agency NYCT, the base fare for subway and local bus passengers was $2.25.

62.     Under the 2010 pricing policies of Defendant MTA and its constituent agency NYCT, there was a provision for free bus-to-subway transfer, so a trip involving a local bus ride and a subway ride had a base fare of $2.25, 50 percent higher than the cost of the equivalent trip in August, 1981.

63.     Under the 2010 pricing policies of MTA and its constituent agency NYCT, the base fare for SIR passengers was $2.25, and there was a provision for free SIR-to-bus and SIR-to-subway transfer.

64.     Under the 2010 pricing policies of MTA and its constituent agency NYCT, there was a provision for free express bus to subway transfer and free express bus to local bus transfer.

65.     Under the 2010 pricing policies of Defendants, the standard one-way toll for the Major Crossings (or one-way equivalent toll, in the case of the Verrazano Narrows Bridge) was $5.50 for passenger vehicles, 450 percent higher than the cost of the equivalent trip in August, 1981.

66.     Further, under the 2010 pricing policies of Defendant MTA and its constituent agency NYCT, a passenger using the electronic fare medium known as the Metrocard could lower the $2.25 base fare to an effective fare of   $1.96 by spending $8.00 or more in a Metrocard transaction and receiving a 15% bonus value on the card. See, e.g., "Metropolitan Transportation Authority Initial Fare Policy Proposal July 28, 2010," mta.info/news/pdf/july10_presentation.pdf, p. 3, last retrieved on August 4, 2010.

67.     Alternatively, under the 2010 pricing policies of Defendant MTA and its constituent agency NYCT, a passenger using one of the "unlimited" versions of the Metrocard could lower the effective fare even below the $1.96 level; for example, a passenger purchasing an unlimited 30-day Metrocard who used it three times a day could lower the effective fare to $0.989.  See id., p.4, last retrieved on August 4, 2010.

68.     NYCT and SIR receive, directly or indirectly, an inter-agency subsidy of TBTA Surplus Funds.

69.     NYCT and SIR services are not functionally related to TBTA's water-crossing facilities for motor vehicles.

## Long Island Rail Road (LIRR)

70.     LIRR is a constituent agency and subsidiary of the MTA.

71.     The LIRR system is comprised of over 700 miles of track on 11 different branches, stretching 120 miles from Montauk - on the eastern tip of Long Island - to Penn Station in Manhattan, and Atlantic Terminal in Brooklyn. See mta.info/lirr/about/, last visited on August 10. 2010.

72.     LIRR offers passenger rail service between 124 stations in five counties in New York: New York (Manhattan), Queens, Kings (Brooklyn), Nassau and Suffolk.

73.     Except for Penn Station in Manhattan, all LIRR stations are situated east of the East River, and thus travel between adjacent LIRR station stops does not involve crossing the bodies of water that the TBTA facilities span, except when one of the stations is Penn Station in Manhattan.

74.     Many of the LIRR's trains originate or terminate at the Atlantic Terminal (formerly Flatbush Avenue) in Brooklyn, with a number of others originating or terminating at Hunterspoint Avenue and Long Island City in Queens. See mta.info/lirr/about/GeneralInformation/, last visited on August 10. 2010.

75.     A number of other LIRR trains, including certain trains running on the West Hempstead, Montauk and Port Jefferson branches, do not originate or terminate in the five boroughs of New York City.

76.    All LIRR trains offer passenger service between points outside Manhattan.

77.    LIRR promotes its rail service to passengers seeking to travel between points on Long Island; for example, it promotes service for intra-Suffolk County passengers, as follows:

> Jury Duty Special
> Starting September 13, the "Jury Duty Special" train will begin operating on the Main Line/Ronkonkoma Branch to get Suffolk jurors to Riverhead before 9 AM every day the courts are in session. The train will depart from Deer Park at 7:54 AM, making stops at Brentwood (7:59 AM), Central Islip (8:03 AM), Ronkonkoma (8:10 AM), Medford (8:21 AM), Yaphank (8:29 AM) and arriving in Riverhead at 8:55 AM, where a free shuttle bus will take jurors to nearby courthouses. The process is reversed in the afternoon, with trains leaving Riverhead Station at 1:21 PM and 3:58 PM. More than 30,000 Suffolk County residents are summoned to serve on juries in Riverhead every year.

See mta.info/supplemental/lirr/NewTimetablesSep13.htm, last visited August 26, 2010.

78.    Across all 11 LIRR branches, rail service operates at a deficit, as passenger revenues do not meet operating expenses.

79.    In one example the LIRR provided in a recent news release, it stated that

> the Greenport Branch carried the fewest customers in 2009, a total of 69,986, generating $726,304 in revenue, while it cost the LIRR $6 million to operate. While the average fare is $10.38, the actual LIRR cost of providing a ride is $85.91 per customer, for a subsidy per ride of about $75.53. Fare box revenue - money collected from ticket sales - covers only 12% of the actual cost of running trains between Ronkonkoma and Greenport.

See mta.info/lirr/TrainTalk/2010/03-2010.htm, last visited on August 10, 2010.

80.     Passenger fares are typically significantly lower on a per-mile basis for direct service between points in Nassau County, or between points in Nassau and Suffolk counties, than they are between Manhattan and Nassau County. See mta.info/lirr/pubs/LIRRFares.pdf, last visited on August 10, 2010.

81.     For example, under 2010 pricing policies, the fare from Mineola (Zone 4) in Nassau County to Penn Station (Zone 1) in Manhattan, a 20.3 mile ride, was $9.25 for a one way ticket (peak, $6.75 off-peak) or $204.00 for a monthly ticket; and the fare from Northport (Zone 9) in Suffolk County to Mineola, a comparable 21.1 mile ride, was only $4.50 for all one-way tickets or $127.00 for a monthly ticket.

82.     LIRR receives, directly or indirectly, an inter-agency subsidy of TBTA Surplus Funds.

83.     LIRR service is not functionally related to TBTA's water-crossing facilities for motor vehicles.

**Metro-North RailRoad (MNR)**

84.     Metro-North Railroad (MNR) is a constituent agency and subsidiary of the MTA.

85.     MNR offers five lines of passenger rail service over 765 track miles reaching a total of seven New York counties – Manhattan, Bronx, Westchester, Putnam, Duchess, Rockland and Orange – as well as points in Connecticut and New Jersey.

86.     The MNR system includes 120 stations, of which only two – the Grand Central Terminal ("GCT") and the 125th Street station – are located in Manhattan.

87.     With the exception of the two Manhattan stations, all MNR stations are located on the northern sides of the Harlem River and the East River.

88.     All MNR trains offer service to passengers originating and terminating travel outside Manhattan, as well as to passengers travelling strictly within Manhattan between GCT and 125th Street, neither of which need to cross the bodies of water that the TBTA facilities span.

89.     Travel between adjacent MNR station stops does not involve crossing the bodies of water that the TBTA facilities span, except when one of the stations is 125th Street and the adjacent station is outside Manhattan.

90.     MNR operates at a deficit, as passenger fare revenues fall far short of operating expenses.

91.     Passenger fares are typically significantly lower on a per-mile basis for service between stations outside Manhattan than between Manhattan and a station outside Manhattan. See mta.info/mnr/html/planning/fares/TicketFares.pdf, last visited on August 10, 2010.

92.     For example, under 2010 pricing policies, the fare from White Plains (Zone 4) in Westchester County to GCT (Zone 1) in Manhattan, a 22-mile ride, was $9.75 for a one way ticket (peak, $7.25 off-peak) or $210.00 for a monthly ticket; and the fare from Golden's Bridge (Zone 6) to White Plains, a comparable 22-mile ride, was only $4.50 for all one-way tickets or $89.00 for a monthly ticket. *Id.*

93.     MNR receives, directly or indirectly, an inter-agency subsidy of TBTA Surplus Funds.

94.     MNR service is not functionally related to TBTA's water-crossing facilities for motor vehicles.

**TBTA Facilities vs. Comparable Facilities**

95.     Under Defendants' 2010 pricing policy, the base one-way or (one-way equivalent) $5.50 toll for the TBTA Major Crossings was discounted to $4.57 for passenger vehicles using an electronic transponder from the E-ZPass New York Service Center ("NY E-ZPass") passenger vehicles; trucks also received comparable discounts for using a NY E-ZPass.

96.     Under the 2010 pricing policy of Defendants, the base one-way automobile toll for the "Minor Crossings" – the Marine Parkway Gil Hodges Memorial Bridge and the Cross Bay Veterans Memorial Bridge – was $2.75, and the base one-way automobile toll for the Henry Hudson Bridge ("HHB") was $3.00; those using NY E-ZPass paid one-way tolls of $1.71 for the Minor Crossings and $2.09 for the HHB.

97.     In 2010, the one-way equivalent base toll for automobile motorists using the New York State Thruway Authority's Tappan Zee Bridge, a facility comparable in traffic to a TBTA Major Crossing, was $2.50, less than one-half of the $5.50 TBTA Major Crossing one-way or one-way equivalent base toll.

98.     In 2010, the one-way equivalent base toll for automobile motorists using the New York State Bridge Authority's bridges, facilities comparable in traffic to a TBTA Minor Crossing, was $0.50, less than one-fifth of the $2.75 and $3.00

base tolls for, respectively, the TBTA Minor Crossings and the TBTA's Henry Hudson Bridge.

99.     The vehicle tolls on the TBTA are collected by Defendants TBTA and MTA.

100.    The vehicle tolls on the TBTA are all property of the Defendants TBTA and MTA.

101.    The vehicle toll policies concerning the TBTA are all controlled by Defendants TBTA and MTA.

102.    The TBTA facilities are instrumentalities or channels of interstate commerce.

103.    During the relevant time period (that is, within the Class Period as described below), Plaintiffs used TBTA facilities on multiple occasions and paid the standard passenger vehicle toll rates using a NY E-ZPass.

104.    During the relevant time period, TBTA enjoyed high operating margins and earned high returns on its facilities from tolls paid by Plaintiffs and the Class; in 2009 alone, TBTA took in $1,345.6 million in operating revenues and had $528.8 million in operating expenses, resulting in $816.7 million in operating income. See *mta.info/mta/investor/pdf/2010/TBTA audit 2009 Appendix D.pdf*, last retrieved on December 9, 2010.

105.    During the relevant class period, Defendants imposed and collected tolls which generated revenues well in excess of those necessary for construction,

operation, maintenance and debt service of the TBTA facilities and effectively used a large portion of these revenues, amounting to hundreds of millions of dollars, to fund and/or subsidize a variety of capital projects, operations and initiatives unrelated to the TBTA water crossings, including but not limited to the Student Metrocard program that provided free transportation to residents of New York City attending primary or secondary school.

106.    After allowing for debt service on TBTA facilities, most of the TBTA operating surplus is transferred to cover debt service and operating costs of various MTA transit subsidiaries.  According to the most recently available NYCT Consolidated Financial Statement,

> The initial $24 million of the [TBTA] operating surplus is provided to the [NYCT] and the balance is divided equally between the [NYCT] and the MTA. However, the amounts transferred to the [NYCT] and the MTA are net of a provision for debt service on TBTA bonds issued to finance the acquisition of facilities under their respective portions of the Capital Program. For the years ended December 31, 2009 and 2008, $290.6 million and $243.7 million, respectively, were paid from the operating surplus of the TBTA to satisfy the [NYCT]'s portion of debt service requirements.

See *mta.info/mta/investor/pdf/2010/NYCT audit 2009 (Appendix C).pdf,* last visited on December 9, 2010. NYCT also reported receiving $92 million in a separate transfer of TBTA operating surplus in 2009. Id. Thus, NYCT received a total TBTA subsidy of approximately $382 million, and the MTA received a total TBTA subsidy of approximately $358 million ($24 million less), for a combined  transfer of approximately $740 million of the $816.7 million TBTA operating surplus in 2009 alone.

107.   Defendants' practice of setting tolls at a level to produce TBTA revenues grossly exceeding TBTA expenses and using those funds for projects unrelated to the TBTA facilities, including but not limited to a program subsidizing educational expenses of City residents exclusively, discriminated against or impermissibly burdened the interstate commerce activities of Plaintiffs and the Class.

108.   Defendants set tolls at a level that deterred the interstate and intrastate travel of Plaintiffs and the Class and/or penalized their exercise of the right to travel.

109.   Defendants' impositions thus constituted violations of the Commerce Clause and the constitutional right to travel.

110.   Plaintiffs' use of the TBTA facilities and the unjust, unreasonable and excessive tolls collected by Defendants for that usage all directly implicate interstate commerce and monetarily affect the travel of citizens of the United States.  The exact amounts of the unreasonable and excessive tolls collected are presently unknown and exclusively within the knowledge of Defendants, but the total is, upon information and belief, substantial.   No substantial government interest supports the toll structure, and whatever ends it seeks to achieve could be achieved by alternatives that do not discriminate against or unduly burden interstate commerce.

111.   By charging Plaintiffs and the other class members for tolls at an unreasonable and excessive rate, Defendants have violated the U.S. Constitution's

Commerce, Privileges or Immunities and/or Equal Protection Clauses. This scheme, under which Defendants illegally charged Plaintiffs and the other members of the Class monies to which Defendants were not legally entitled, has resulted in the unjust enrichment of Defendants to the detriment of Plaintiffs and the other members of the Class who paid these rates.

112.    Unless enjoined, Defendants will continue to charge unreasonable and excessive tolls to Plaintiffs and others in the Class who continue to use TBTA facilities.

## CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class (the "Class") of:

> All United States citizens and entities who, since December 30, 2004 (the "Class Period") paid tolls at the full E-ZPass or cash rate for crossing a TBTA facility with a vehicle, where either the facility had no resident discount program or the vehicle class was ineligible for a resident discount program. Excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

114.    The members of the class are so numerous as to render joinder impracticable. Upon information and belief, each day thousands of United States citizens and businesses pay tolls for the use of the facilities at issue in this lawsuit.

115.    Common questions of law and fact exist as to all members of the Class, in that they all have and had their rights to the protections provided by the United

States Constitution and Defendants have acted in a common manner towards Plaintiffs and all the members of the Class.   The common questions of law and fact that exist relate to the maintenance of the discriminatory toll policies alleged herein and whether Defendants have any basis for these policies so as to make them constitutionally permissible.  These claims are archetypically common and identical as to all members of the Class.

116.   Plaintiffs' claims are typical of the claims of the members of the Class inasmuch as both named Plaintiffs are members of the Class and have paid the unlawfully excessive tolls and, by virtue of their continued use of Defendants' facilities, will hereafter continue to pay the unlawfully excessive tolls unless Defendants are enjoined from maintaining their toll scheme.  Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the Class.  Plaintiffs have no interests that are adverse to the interests of the members of the Class, have retained counsel experienced in class action litigation to prosecute their claims, and are adequate Class representatives.

117.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all of the individual members of the Class is impracticable given the large number of Class members and the fact that they are dispersed over a large geographical area.  Furthermore, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them.  The cost to

the federal court system of adjudicating thousands of individual cases would be

enormous.  Individualized litigation would also magnify the delay and expense to all

parties and the court system.  By contrast, the conduct of this action as a class

action in this District presents far fewer management difficulties, conserves the

resources of the parties and the court system, protects the rights of each member of

the Class, and permits resolution of the controversy presented in a single, unitary

proceeding.

118.    Upon information and belief, there are no other actions pending to

address the Defendants' allegedly wrongful conduct.

119.    This action, in part, seeks declaratory and injunctive relief.  As such,

the Plaintiffs seek class certification under Fed. R. Civ. P. 23(b)(2), in that all Class

members were subject to the same toll policies and their individual monetary

damages are incidental to the existence of the allegedly constitutionally-violative

policies.  In addition to that relief, or in the alternative, Plaintiffs seek certification

under Rule 23(b)(3) or seek partial certification under Fed. R. Civ. P. 23(c)(4).


## COUNT I

**AS AND FOR A FIRST CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983 AGAINST
ALL DEFENDANTS FOR VIOLATION OF THE COMMERCE CLAUSE,  THE
PRIVILEGES AND IMMUNITIES CLAUSE, AND THE FOURTEENTH
AMENDMENT OF THE UNITED STATES CONSTITUTION**

120.    Plaintiffs restate, reallege and incorporate herein by reference all

foregoing paragraphs as if set forth fully in this count.

24

121.   Defendants, under color of law, conspired with one another to deprive plaintiffs and members of the Class of their constitutional rights, including their rights under the Commerce Clause, because by charging them an unreasonable and excessive amount for traveling on TBTA facilities, their toll programs imposed impermissible burdens on interstate commerce.

122.   Defendants, under color of law, conspired with one another to deprive plaintiffs and members of the Class of their rights under the Privileges or Immunities Clause, the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment or, alternatively, under the Privileges and Immunities Clause of Article IV, because the programs impinged upon their fundamental right to travel by charging them an unreasonable and excessive amount for the use of TBTA crossing facilities.

123.   Defendant Walder, acting individually and in his official capacity as supervisory and/or administrative officer of Defendant MTA, under color of law, did institute, authorize, ratify, permit and/or acquiesce in the enactment and the enforcement of the toll scheme, contrary to the Commerce Clause, the Privileges and Immunities Clause and the Fourteenth Amendment, in violation of  Plaintiffs' and the Class's rights to engage in interstate commerce and interstate and intrastate travel, and thus in violation of the laws of the United States and of 42 U.S.C. § 1983.

124.   As a direct and proximate result of Defendants' violation of one or more of the constitutional rights of Plaintiffs and the Class, Plaintiffs and the Class

have sustained ascertainable damages related to the collection of tolls in an amount to be determined at trial, and unless Defendants are enjoined, Plaintiffs and the Class will continue to suffer such damages hereafter.

125.   This conduct on the part of all Defendants represents a violation of 42 U.S.C. § 1983, given that their actions were undertaken under color of state law.

126.   Plaintiffs are entitled to declaratory, injunctive and compensatory relief, as is set forth below.

127.   Plaintiffs are entitled to attorney fees under 42 U.S.C. § 1988.

## COUNT II

### AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

128.   Plaintiffs restate, reallege and incorporate herein by reference all foregoing paragraphs as if set forth fully in this count.

129.   By virtue of their obtaining monies in connection with their practices which are unconstitutional under the United States Constitution, Defendants have been unjustly enriched to the detriment of Plaintiffs and the other members of the Class.

130.   Defendants' retention of the monies it has gained through its wrongful acts and practices would be unjust considering the circumstances of their obtaining those monies.

131.   Defendants should be required to make restitution to Plaintiffs and the other members of the Class, in an amount to be determined, of the monies by which they have been unjustly enriched.

## COUNT III

### AS AND FOR A THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR MONEY HAD AND RECEIVED

132.   Plaintiffs restate, reallege and incorporate herein by reference all foregoing paragraphs as if set forth fully in this count.

133.   Defendants charged tolls, or caused the charging of tolls, to Plaintiffs and other members of the Class in an amount that Defendants were not legally entitled to, and by doing so Defendants collected or received money belonging to Plaintiffs and other members of the Class to which Defendants were not entitled.

134.   Defendants benefited from the receipt of the money unlawfully collected from the Plaintiffs and the members of the Class, and Plaintiffs and the members of the Class have a right under the circumstances to have such monies returned to them, in whole or part, under principles of law.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ANGUS PARTNERS, LLC, and WHITE CRANE MARTIAL ARTS, INC., on behalf of themselves and on behalf of a Class of others similarly situated, request that this Honorable Court grant them the following relief:

A.   An order certifying this action as a class action under Fed. R. Civ. P. 23 with Angus Partners, LLC and White Crane Martial Arts, Inc. as Class representatives;

B.   A declaratory judgment against Defendants declaring their toll collection and redistribution policies, practices and programs to be unconstitutional and improper;

C.   A preliminary and permanent injunction enjoining Defendants from continuing to engage in their toll collection and redistribution policies, practices and programs;

D.   A judgment against all Defendants, awarding damages and/or restitution to each named Plaintiff and each member of the proposed Class in an amount to be determined by a Jury and/or the Court on both an individual and a class wide basis; and

E.   A monetary award for attorney's fees and the costs of this action, including, if applicable, expert witness fees, under 42 U.S.C. § 1988 and Fed. R. Civ. P. 23.

F.     For such other and further relief as to the Court seems proper,

together with the costs of this action.

Dated: New York, New York
       December 30, 2010

Respectfully Submitted,

By: _____

Harley J. Schnall
One of Plaintiffs' Attorneys

Attorneys for Plaintiffs and Class

Brian L. Bromberg
Bromberg Law Office, P.C.
40 Exchange Place, Suite 2010
New York, NY 10005
(212) 248-7906

Harley J. Schnall
Law Office of Harley J. Schnall
711 West End Avenue
New York, NY 10025
(212) 678-6546