UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANGUS PARTNERS LLC d/b/a Angus
Energy and WHITE CRANE MARTIAL
ARTS, INC., individually and on behalf of
all others similarly situated,

*Plaintiffs*,

v.

JAY WALDER, individually and in his
official capacity, JAMES FERRARA,
individually and in his official capacity,
METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH
BRIDGE AND TUNNEL AUTHORITY
d/b/a METROPOLITAN
TRANSPORTATION AUTHORITY
BRIDGES & TUNNELS,

*Defendants*.

11 Civ. 0039 (ANT)
ECF Case

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
DISMISSING THE COMPLAINT WITH PREJUDICE**

Leslie Gordon Fagen
Walter Rieman
Steven C. Herzog
Joshua D. Kaye
Melissa C. Monteleone
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel:  (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants*

**Table of Contents**

**Page**

Preliminary Statement ...................................................................................1

Statement of Facts.........................................................................................4

      A.    The Integrated Transportation System Operated
           by the MTA's Affiliates and Subsidiaries ...............................4

      B.    The Mission of the MTA and its Affiliates and Subsidiaries ....................6

      C.    Economic Benefits of New York's
           Integrated Transportation System ............................................10

      D.    Usage of TBTA Toll Revenue for Certain Specific Programs ................11

      E.    This Action ...............................................................................12

Argument .....................................................................................................13

I.      Summary Judgment Standard .............................................................13

II.     The TBTA Tolls Do Not Violate the Commerce Clause .....................13

      A.    The TBTA Tolls Do Not Discriminate
           Against Interstate Commerce ...................................................15

      B.    The TBTA Tolls Satisfy the First
           Two Prongs of the Northwest Airlines Test .............................17

III.    The TBTA Tolls Do Not Violate the Right to Travel .........................26

IV.    Plaintiffs' Common Law Claims under New York Law Have No Merit.............29

Conclusion ...................................................................................................30

## Table of Authorities

**Page(s)**

### Cases

*Alamo Rent-a-Car, Inc.* v. *Sarasota-Manatee-Airport Auth.*,
906 F.2d 516 (11th Cir. 1990) ...................................................................21

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................13

*Anesthesia Assocs. of Mt. Kisco, LLP* v. *N. Westchester Hosp. Cntr.*,
59 A.D.3d 473 (N.Y. App. Div. 2d Dep't 2009) .......................................29

*Auto. Club of N.Y., Inc.* v. *Port Auth. of N.Y. & N.J.*,
887 F.2d 417 (2d Cir. 1989) ......................................................................18

*Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist.* v. *Rettaliata*,
576 N.E.2d 716 (N.Y. 1991).......................................................................29

*Bridgeport & Port Jefferson Steamboat Co.* v. *Bridgeport Port Auth.*,
567 F.3d 79 (2d Cir. 2009) ..........................................................21, 22, 23

*Celotex Corp.* v. *Catrett*,
477 U.S. 317 (1986)...................................................................................13

*Evansville-Vanderburgh Airport Auth. Dist.* v. *Delta Airlines, Inc.*,
405 U.S. 707 (1972)...........................................................................passim

*Kelen* v. *Mass. Tpk. Auth.*,
2007 WL 1418510 (Mass. Super. Ct. May 3, 2007).................................27

*Kerzer* v. *Kingly Mfg.*,
156 F.3d 396 (2d Cir. 1998) ......................................................................13

*McBurney* v. *Young*,
133 S. Ct. 1709 (2013)...................................................................1, 14, 17

*Miller* v. *Reed*,
176 F.3d 1202 (9th Cir. 1999) ...................................................................26

*Molinari* v. *N.Y. Triborough Bridge & Tunnel Auth.*,
838 F. Supp. 718 (E.D.N.Y. 1993) .................................................2, 7, 18

*Northwest Airlines, Inc.* v. *County of Kent*,
510 U.S. 355 (1994).....................................................................................1

**Page(s)**

*Pike* v. *Bruce Church, Inc.*,
  397 U.S. 137 (1970)..................................................................................14

*Selevan* v. *N.Y. Thruway Auth.*,
  2011 WL 5974988 (N.D.N.Y. Nov. 28, 2011) (*Selevan II*), *aff'd,* 711 F.3d
  253 (2d Cir. 2013)...................................................................................28

*Selevan* v. *N.Y. Thruway Auth.*,
  584 F.3d 82 (2d Cir. 2009) (*Selevan I*)...............................................passim

*Selevan* v. *N.Y. Thruway Auth.*,
  711 F.3d 253 (2d Cir. 2013) (*Selevan III*)....................................2, 4, 27, 28

*Surprenant* v. *Mass. Tpk. Auth.*,
  2010 WL 785306 (D. Mass. Mar. 4, 2010) ........................................14, 28

*Town of Southold* v. *Town of E. Hampton*,
  477 F.3d 38 (2d Cir. 2007) ...............................................................15, 27

*Wallach* v. *Brezenoff*,
  930 F.2d 1070 (3d Cir. 1991) ................................................15, 18, 20, 27

*Weisshaus* v. *Port Auth. of N.Y. & N.J.*,
  497 F. App'x 102 (2d Cir. 2012) .........................................................26, 27

# STATUTES

42 U.S.C. § 1983...........................................................................................13

N.Y. Pub. Auth. Law § 552 ...........................................................................6

N.Y. Pub. Auth. Law § 552(2)..........................................................8, 18, 22

N.Y. Pub. Auth. Law § 553 ...........................................................................6

N.Y. Pub. Auth. Law § 553(9), (12), (17) ..........................................8, 18, 22

N.Y. Pub. Auth. Law § 569-c ...............................................8, 12, 18, 22

N.Y. Pub. Auth. Law § 1202 ........................................................................4

N.Y. Pub. Auth. Law § 1203-a .....................................................................4

N.Y. Pub. Auth. Law § 1219-a ...................................................................18

N.Y. Pub. Auth. Law § 1219-a(2)(b) .............................................................8

N.Y. Pub. Auth. Law § 1264 .............................................................6, 7, 8, 22

**Page(s)**

N.Y. Pub. Auth. Law § 1269(1)(a), (10) .......................................................................8, 18

N.Y. Pub. Auth. Law § 1270-d ..........................................................................................18

N.Y. Pub. Auth. Law § 1270-d(1) ........................................................................................8

N.Y. Pub. Auth. Law § 1277-a ..........................................................................................18

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I, § 8, cl. 3 ..............................................................................1, 3, 14, 17

U.S. Const Amend. XIV .....................................................................................................29

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ..........................................................................................................13

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment dismissing the Complaint with prejudice.

### Preliminary Statement

A portion of the toll revenues from TBTA bridges and tunnels is used to support the subway, bus, and commuter rail system in New York City and the surrounding suburbs. That use of toll revenues reflects the longstanding policy established by the New York Legislature and the TBTA and MTA Boards under which the surplus generated by TBTA tolls is used to support the integrated public transportation system operated by MTA affiliates and subsidiaries. According to plaintiffs, however, this use of toll revenues results in a violation of their constitutional rights. Although originally filed as class action, plaintiffs have decided not to file a motion for class certification, and the parties have completed fact and expert discovery. The relevant facts are undisputed. For the reasons explained below, defendants' motion for summary judgment should be granted, and the Complaint should be dismissed with prejudice.

Plaintiffs' principal claim is that the Legislature's decision to authorize the use of TBTA toll revenue for the support of mass transit was unconstitutional under the so-called dormant Commerce Clause. Plaintiffs, however, cannot show that the tolls—most of which are paid by New Yorkers, rather than residents of other states—are the product of "economic protectionism . . . designed to benefit in-state economic interests by burdening out-of-state competitors." *McBurney* v. *Young*, 133 S. Ct. 1709, 1719 (2013). To prove that the TBTA tolls qualify as such "economic protectionism," they must satisfy one of the prongs of the tripartite test set out by the Supreme Court in *Northwest Airlines,*

1

*Inc.* v. *County of Kent*, 510 U.S. 355, 369 (1994); *see also Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 98 (2d Cir. 2009) ("*Selevan I*"). Plaintiffs cannot do so.

First, it is plain that the tolls at issue are not discriminatory: They are applicable to New York residents and non-New York residents, interstate and intrastate trips alike. And plaintiffs do not allege a discriminatory purpose. As a result, plaintiffs cannot identify, not do they even try, a specific "in-state commercial interest that is favored" by the tolls, nor a specific "out-of-state competitor" that is harmed by them. *Selevan I*, 584 F.3d at 95.

Second, the record developed during discovery shows that the TBTA tolls are both "based on some fair approximation of the use of the facilities" and are "not excessive in relation to the benefits conferred." *Id.* at 96. In evaluating the charge for use of transportation facilities, courts look to whether the proceeds are directed to uses "which either enable[ ] or expedite[ ] passengers' travels." *Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 260 (2d Cir. 2013) (*Selevan III*). The record shows that to be the case here. The tolls paid by plaintiffs are used to fund the maintenance, upkeep, and operation of the bridges and tunnels they use, and the commuter rail, subway, and bus lines operated by the New York City Transit Authority ("NYCTA"), the Long Island Rail Road ("LIRR") and the Metro-North Railroad ("MNR") that serve New York City and its suburbs. Both the bridges and tunnels themselves and the public transportation system are part of an integrated transportation system that provides substantial benefits to drivers. Indeed, the uncontroverted evidence in this case shows—as Judge Korman recognized twenty years ago—that "vehicular traffic would grind to a halt" without the bridges, tunnels and public transit system working in concert. *Molinari* v. *N.Y.*

*Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 719 (E.D.N.Y. 1993).  Because the tolls paid by plaintiffs do not discriminate against interstate commerce, are based on a fair approximation of use of the facilities, and are not excessive when compared to the benefits users receive, plaintiffs' dormant Commerce Clause claim fails.

Plaintiffs also claim that it is improper to use TBTA toll revenues to support several specific programs, which they contend are allegedly "operations, projects and initiatives" that are unrelated to the TBTA facilities.  They identify Student MetroCard, Arts for Transit, MTA Bus, and Long Island Bus before the termination of its operations as such programs.  This argument fails because (1) each of these programs is a part of the integrated transportation system, and the MTA has appropriately exercised its discretion in funding these programs, (2) drivers using the bridges and tunnels do, in fact, benefit from these programs, and (3) in any event, TBTA tolls are not used to fund MTA Bus, Long Island Bus, or the Arts for Transit operating budget.

Plaintiffs' claim that the tolls at issue violate their constitutional right to travel fares no better.  As the Second Circuit has recognized, "[m]inor burdens impacting interstate travel, *such as toll roads*, do not constitute a violation [of the right to travel]." *Selevan I*, 584 F.3d at 101 (quoting *Miller* v. *Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999)). Plaintiffs rest their claim to the contrary on the allegation that the tolls at issue here "deterred the interstate and intrastate travel of Plaintiffs" and "penalized their exercise of the right to travel."  (Compl. ¶ 108, ECF No. 1.)  Yet plaintiffs have offered no evidence from which a trier of fact could conclude that the tolls at issue have deterred plaintiffs from traveling, or that they represent the "sort of 'invidious distinctions' that penalize the right to travel" rather than a "case[ ] in which a state has simply levied 'a charge designed

only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance.'" *Selevan III*, 711 F.3d at 258.

Finally, plaintiffs' state law claims depend upon a showing that the toll policies at issue are otherwise unlawful, and they too should consequently be dismissed.

### Statement of Facts

**A.    The Integrated Transportation System Operated by the MTA's Affiliates and Subsidiaries**

The MTA's subsidiaries and affiliates operate three main categories of transportation options that convey people and goods throughout the New York metropolitan area:  (1) the subways and buses, (2) the commuter railroads, and (3) the toll bridges and tunnels within the City of New York (the "City").

**1.    Subways and Buses**

The New York City Transit Authority ("NYCTA"), an affiliate of the MTA, operates the subways and, with its subsidiary the Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA"), buses within the City (which include all buses currently in the MTA network except for those run by MTA Bus).  (*See* N.Y. Pub. Auth. Law §§ 1202, 1203-a; Declaration of Steven C. Herzog, dated Sept. 27, 2013 ("Herzog Decl."), Ex. 1 (The MTA Network).)  More than two billion people travelled on NYCTA subways and buses in 2012 and 7.6 million people rode the subways and buses every weekday.  (Herzog Decl., Ex. 1.)  NYCTA operates 24 subway lines and 224 bus routes, and has 45,537 employees.  (*Id.*)  NYCTA has an operating budget for 2013 of $9.9 billion.  (*Id.*)[1]

---

[1]    NYCTA also operates the Staten Island Railway, which is a subsidiary of MTA. (Herzog Decl., Ex. 1.)  The Staten Island Railway consists of a single line, with an annual ridership of 4.4 million, and 15,993 people riding each weekday.  (*Id.*)  The

The MTA Bus Company, a subsidiary of the MTA, was created in 2004 to service areas formerly served by seven private bus companies.  (*Id.*; Herzog Decl., Ex. 2 (Moss Report) at 23-24.)  In 2012, MTA Bus had an annual ridership of 120.9 million and an average weekday ridership of 390,685.  (Herzog Decl., Ex. 1 (The MTA Network).)  It operates 79 bus routes, covering 927 miles, and has 3,629 employees.  (*Id.*)  In 2013, MTA Bus has an operating budget of $661.8 million.  (*Id.*)

Prior to January 1, 2012, the MTA also operated Long Island Bus pursuant to an agreement with Nassau County.  (Herzog Decl., Ex. 3 (Ring Tr.) at 42-43; Herzog Decl., Ex. 4 (Johnson Tr.) at 31.)  Long Island Bus operated primarily, though not exclusively, in Nassau County.  (Herzog Decl., Ex. 3 (Ring Tr.) at 44.)  As of January 1, 2012, Nassau County privatized bus operations in the County.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 31.)

### 2.   Commuter Railroads

The MTA network includes two main commuter railroads:  the Long Island Rail Road ("LIRR") and the Metro-North Railroad ("MNR"), both MTA subsidiaries.

LIRR is one of the largest commuter railroads in the nation, with 594 miles of track and 11 rail lines.  (Herzog Decl., Ex. 1 (The MTA Network).)  With an annual ridership of 81.8 million, LIRR serves approximately 285,082 weekday customers on 1,165 rail cars and has 6,414 employees.  (*Id.*)  In 2013, LIRR has an operating budget of $1.7 billion.  (*Id.*)

---

Staten Island Railway has 271 employees and its 2013 operating budget is $53.7 million.  (*Id.*)

MNR serves New York City's northern suburbs with three major lines: Harlem, New Haven, and Hudson.  (*Id.*)  It has 795 miles of track, an average of 281,331 passengers every weekday, and an annual ridership of 83 million.  (*Id.*)  MNR has 6,002 employees and its 2013 operating budget is $1.4 billion.  (*Id.*)

### 3.      Bridges and Tunnels

The TBTA, an affiliate of the MTA, owns and oversees the operations of nine toll bridges and tunnels within the City:  the Robert F. Kennedy Bridge (formerly, the Triborough Bridge), the Throgs Neck Bridge, the Verrazano-Narrows Bridge, the Bronx-Whitestone Bridge, the Henry Hudson Bridge, the Marine Parkway-Gil Hodges Memorial Bridge ("Marine Parkway Bridge"), the Cross Bay Veterans Memorial Bridge ("Cross Bay Bridge"), the Queens Midtown Tunnel, and the Hugh L. Carey Tunnel (formerly, the Brooklyn Battery Tunnel).  (N.Y. Pub. Auth. Law § 553; Herzog Decl., Ex. 1 (The MTA Network).)  In 2012, 282.8 million vehicles travelled through or across the TBTA's tunnels and bridges.  (Herzog Decl., Ex. 1 (The MTA Network).)  The TBTA has 1,545 employees and its 2013 operating budget is $586.5 million.  (*Id.*)

### B.      The Mission of the MTA and its Affiliates and Subsidiaries

The MTA was created by the New York State Legislature in 1965 (initially as the Metropolitan Commuter Transportation Authority).  (N.Y. Pub. Auth. Law § 1264; Herzog Decl., Ex. 1 (The MTA Network); *see also* Herzog Decl., Ex. 2 (Moss Report) at 5; Herzog Decl., Ex. 6 (Small Report) at 5-6.)  In 1968, the NYCTA (and its subsidiary, MaBSTOA) and TBTA were placed under the common control of the MTA Board.  (N.Y. Pub. Auth. Law §§ 552, 1264; *see also* Herzog Decl., Ex. 2 (Moss Report) at 26; Herzog Decl., Ex. 6 (Small Report) at 5.)  From the MTA's inception, it has been and remains responsible for continuing, developing, and improving commuter

transportation, including the subways, buses, commuter railroads, and toll bridges and tunnels that serve the New York City metropolitan region and for the development and implementation of "a unified mass transportation policy for [the metropolitan commuter transportation] district" for the benefit of the people of the State of New York.  N.Y. Pub. Auth. Law § 1264.

Consolidating control of these entities was deemed necessary because New York's mass transportation system, which once "was probably the best in the world," had become, in the years before the MTA was created, "quite possibly the worst."  *Molinari*, 838 F. Supp. at 720 (quoting Robert A. Caro, *The Power Broker* 911 (Vintage Books 1975)).  "[R]ecognizing 'that the movement of people and goods in a great metropolitan region required a *balanced* transportation *system*,' the New York State Legislature created the [MTA]."  *Id.* (citation omitted) (quoting Caro at 897).  In placing the MTA (and its subsidiaries), the NYCTA (and its subsidiary MaBSTOA), and the TBTA under common control, the Legislature recognized that the MTA needed to be able to use revenues generated by the bridges and tunnels for the support of NYCTA's subways and buses and the commuter railroads that are part of the New York metropolitan area's mass transportation system.  *See* L. 1965, c. 324 § 1 (N.Y. 1965); L. 1967, c. 717 § 60 (N.Y. 1968).  The bridges and tunnels generate over one billion dollars in toll revenue annually.  (Herzog Decl., Ex. 7 (Financial Statements as of & for the Years Ended December 31, 2011 and 2010) at 12.)  TBTA's bridges and tunnels, however, would be overwhelmed with traffic, and thus could not function effectively, in the absence of a mass transportation system.  (Herzog Decl., Ex. 2 (Moss Report) at 42-44; Herzog Decl., Ex. 6 (Small Report) at 16, 20.)

Thus, from MTA's inception through the present, TBTA has been authorized by the Legislature to establish and collect tolls sufficient to support not only direct TBTA operations and capital projects, but also the MTA's larger mission of providing an integrated transportation network.  (*See* N.Y. Pub. Auth. Law §§ 552(2), 553(9), (12), (17), 569-c, 1219-a(2)(b), 1269(1)(a), (10), 1270-d(1); *see also* N.Y. Pub. Auth. Law § 1264; Herzog Decl., Ex. 2 (Moss Report) at 26; Herzog Decl., Ex. 6 (Small Report) at 6.)  That integrated transportation network benefits all travelers in the region, including both those traveling by automobile and those using public transportation. Accordingly, in 2011, pursuant to statute, the TBTA provided $939.6 million from tolls and other sources of revenue in total support for mass transit and the commuter rails. (Herzog Decl., Ex. 7 (Financial Statements as of & for the Years Ended December 31, 2011 and 2010) at 12; Herzog Decl., Ex. 8 (Feb. 6, 2012 Staff Summary) at V-1, V-10.) TBTA's support for transit included operating surplus of approximately $201,545,000 to NYCTA and approximately $326,113,000 to the MTA for LIRR and MNR; and debt service payments of approximately $131,637,000 on MTA's behalf and approximately $280,205,000 on NYCTA's behalf.  (Herzog Decl., Ex. 7 (Financial Statements as of & for the Years Ended December 31, 2011 and 2010) at 12; Herzog Decl., Ex. 8 (Feb. 6, 2012 Staff Summary) at V-10.)  TBTA also transferred $85,100 in investment income to the MTA.  (Herzog Decl., Ex. 8 (Feb. 6, 2012 Staff Summary) at V-1.)

The use of bridge and tunnel revenues to support public transportation reflects the interconnectedness of their functional operations.  An enormous number of people travel in and about the New York region each year.  In 2011, the annual ridership on MTA public transportation was 2.6 billion, while TBTA bridges and tunnels carried

more than 280 million vehicles.  (Herzog Decl., Ex. 1 (The MTA Network).)  This

volume of travel is made possible by the combined operation of mass transportation and

travel by car.  Mass transit diverts a significant number of travelers from the bridges,

tunnels and accompanying roadways connecting New York City and the surrounding

region.  Four of every five rush-hour commuters to New York's central business district[2]

take mass transit.  (Herzog Decl., Ex. 1 (The MTA Network); Herzog Decl., Ex. 2 (Moss

Report) at 5.)  By diverting travelers in the region from the roadways, New York's mass

transit network makes it possible for users of the roadways to travel without excessive

road congestion.  (Herzog Decl., Ex. 6 (Small Report) at 20.)  Undisputed fact and expert

evidence in this case establishes that, as Professor Kenneth A. Small has opined, absent

public transportation options, "the road facilities would be overwhelmed by demand far

exceeding their capacities."  (*Id.* at 16; *see also* Herzog Decl., Ex. 9 (MTATBTA-A

2884) at MTATBTA-A 2889 ("Given the interdependence of the highway and transit

networks, a decline in transit service quality can be expected to result in increased use of

the already over-burdened highway network, without any practical means to provide

additional road capacity."); *id.* at MTATBTA-A 2892-93 (documenting increased

congestion as result of December 2005 Transit strike); Herzog Decl., Ex. 2 (Moss Report)

at 42-44 (arguing that encouraging travelers who have the option of driving to choose

public transit reduces bridge congestion).)

      The disruptions in the wake of Superstorm Sandy illustrate the

interconnectedness of New York's transportation network.  As Professor Mitchell Moss

observed, "[i]n the days following Superstorm Sandy, without the subways and

---

[2]    New York's central business district is defined as Manhattan south of 60th Street.
(Herzog Decl., Ex. 9 (MTATBTA-A 2884) at MTATBTA-A 2887.)

commuter railroads operating normally, major arteries leading to Manhattan were jammed and city streets were in gridlock. . . .  The severe gridlock conditions prompted Governor Cuomo to declare a transportation emergency."  (Herzog Decl., Ex. 2 (Moss Report) at 64-65.)  Although emergency rules requiring that cars entering Manhattan have at least three passengers and the resumption of partial subway and commuter rail services helped to decrease traffic volumes, "without a fully functioning multi-modal regional transportation system—including subways, commuter rail, and vehicular tunnels—commuting times were substantially longer than normal"—more than doubling "from an average of 47 minutes pre-Sandy to an average of 115 minutes post-Sandy." (*Id.* at 65.)

> **C.** **Economic Benefits of New York's Integrated Transportation System**

In addition to taking drivers off the road, New York's mass transportation system also makes possible the economic vitality of the New York City metropolitan region.  Professor Small explains that "[t]he ability of a large urban area like New York to sustain its economic vitality, despite high costs, is widely recognized as due to advantages of size," known as "economies of agglomeration."  (Herzog Decl., Ex. 6 (Small Report) at 4.)  The advantages of agglomeration in turn depend on "good transportation options to connect people throughout the urban area."  (*Id.*)  As a result:

> [T]he users of the bridges are receiving the benefits of the regional agglomeration in the New York region, made possible by the integrated transportation system that the bridges and tunnels are part of.  That agglomeration makes the region substantially more productive economically, resulting in increased economic activity, including wage rates, and makes possible the enormous cultural and other benefits available (and in some cases, only available) in the New York region.

(*Id.* at 20-21; *see also* Herzog Decl., Ex. 2 (Moss Report) at 57 ("The services provided by the MTA and its affiliates make possible the significant density of economic activity

that characterizes the New York metropolitan area, and that fuels its productivity and prosperity and that of the larger region and state."); Herzog Decl., Ex. 9 (MTATBTA-A 2884) at MTATBTA-A 2889 ("If a well-run mass transportation system were not available . . . the New York metropolitan region would become less competitive with other parts of the country.").

### D.    Usage of TBTA Toll Revenue for Certain Specific Programs

Not all MTA functions are subsidized by TBTA surplus monies.  The MTA headquarters' operating deficit is funded entirely by taxes, specifically the Mortgage Recording Taxes 1 and 2 and Payroll Mobility Taxes.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 92-93; Herzog Decl., Ex. 14 (Johnson Ex. 3).)  The MTA's internal subsidies to Long Island Bus came, in turn, from MTA headquarters.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 92; *see also* Herzog Decl., Ex. 15 (Johnson Ex. 4).)  The Arts for Transit program's operating budget is likewise funded out of MTA headquarters. (Herzog Decl., Ex. 4 (Johnson Tr.) at 104-06; Herzog Decl., Ex. 16 (Johnson Ex. 8).) MTA Bus is funded by New York City (as is the Staten Island Railway).  (Herzog Decl., Ex. 4 (Johnson Tr.) at 108-11; Herzog Decl., Ex. 17 (Johnson Ex. 6); Herzog Decl., Ex. 3 (Ring Tr.) at 57-59, 61.)  Thus, none of the monies that were transferred from the TBTA were used for Long Island Bus, MTA Bus, or the Arts for Transit operating budget. (Herzog Decl., Ex. 4 (Johnson Tr.) at 104-06, 136-37)  TBTA surplus monies are divided, according to a statutory formula, between the New York City Transit Authority and the MTA, and the MTA portion is used for the commuter railroads.  (N.Y. Pub. Auth. Law §§ 569-c, 1219-a, 1277-a; Herzog Decl., Ex. 4 (Johnson Tr.) at 116-17.)  While TBTA surplus revenue is used to support the New York City Transit Authority, the "cost" of the Student MetroCard program is primarily foregone revenue, not out-of pocket

11

expenditures, as the ongoing costs of operating the subway and bus system would be incurred regardless of the fares charged students.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 24-25, 69-70; Herzog Decl., Ex. 3 (Ring Tr.) at 38.)  For 2012, after deducting State and City student fare reimbursements, that foregone revenue totaled approximately $164 million.  (Herzog Decl., Ex. 18 (Johnson Ex. 2).)  But that figure unrealistically assumes that every ride under the program would still occur, even if not subsidized; in reality, if Student MetroCards were not provided to students, many would likely use other means of transportation, such as walking or carpooling.  (*Id.*; *see also* Herzog Decl., Ex. 4 (Johnson Tr.) at 64, 67.)  By comparison, the MTA's total 2012 operating budget was $12.6 billion.  (Herzog Decl., Ex. 20 (The MTA Network—version accessed October 2, 2012).)

### E.    This Action

On January 4, 2011, Angus Partners LLC and White Crane Martial Arts, Inc. filed a class action complaint as both individuals and putative representative plaintiffs.  (ECF No. 1.)  The Complaint claimed that the TBTA's and MTA's toll policies are unconstitutional because toll revenues from TBTA facilities are used to fund operations, projects, and initiatives allegedly unrelated to those facilities, including Student MetroCards, New York City Transit Authority, Long Island Rail Road, Metro-North Railroad, and Long Island Bus operations, among others.  (*Id.*)  The Complaint charges that these toll policies violate various provisions of the United States Constitution, 42 U.S.C. § 1983, and the common law of the State of New York.  (*Id.* ¶¶ 120-34.)  Although the Complaint alleges claims on behalf of a putative class, the representative plaintiffs have decided not to file a motion for class certification, and are pursuing their claims only on their own behalf.  (Compl., ECF No. 1; Joint Status Letter at 2, ECF No. 44.)  Defendants filed an Answer to the Complaint on April 18, 2011 (ECF

12

No. 15).  Fact and expert discovery has been completed.  (Joint Status Letter at 4, ECF No. 44.)

**Argument**

## I.        Summary Judgment Standard

Summary judgment is appropriate where the pleadings, the discovery materials, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the Court must construe the evidence "in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor," "[c]onclusory allegations, conjecture, and speculation" do not suffice to create a genuine factual dispute.  *Kerzer* v. *Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  A factual issue is thus "genuine" only if it "may reasonably be resolved in favor of either party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  Defendants can thus discharge their burden on summary judgment merely by identifying plaintiffs' failure to adduce evidence sufficient to enable a reasonable trier of fact to find in their favor.

## II.       The TBTA Tolls Do Not Violate the Commerce Clause

The Commerce Clause of the United States Constitution grants Congress the power to "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  The Supreme Court has held that this grant of authority implies a limitation on the power of the States to interfere with interstate commerce—the so-called dormant

13

Commerce Clause.  This limitation is driven by a concern about "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *McBurney*, 133 S. Ct. at 1719.  For that reason, the dormant Commerce Clause does not bar transportation authorities like TBTA from charging a "reasonable fee" for the use of bridges and tunnels, provided they do not impose "a burden that is not commensurate with the benefits [] confer[ed]" and does not "discriminate against interstate commerce."  *Selevan I*, 584 F.3d at 98.  To determine whether a toll is constitutionally permissible, the Second Circuit has instructed district courts in this Circuit to apply the test set forth in *Northwest Airlines, Inc.* v. *County of Kent*.  Under that test, a district court must evaluate whether the toll "(1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce."  *Selevan I*, 584 F.3d at 96 (quoting *Northwest Airlines*, 510 U.S. at 369).[3]  Because whether the toll "discriminates against interstate commerce," is a "threshold inquiry," *Selevan I*, 584 F.3d at 94, we address that prong of the *Northwest Airlines* test first.

---

[3]   Defendants recognize that under *Selevan I*, which is controlling precedent in this court, the *Northwest Airlines* test governs the constitutionality of the tolls at issue in this action. In defendants' view, however, the constitutionality of the tolls at issue should be governed not by the *Northwest Airlines* test, but instead by the test set forth in *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970).  *See Surprenant* v. *Mass. Tpk. Auth.*, 2010 WL 785306, at *6 (D. Mass. Mar. 4, 2010) (rejecting *Northwest Airlines* test in favor of *Pike* test).  *Pike* held that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.  Defendants reserve the right to contest the applicability of the *Northwest Airlines* test to this action on appeal.

### A.    The TBTA Tolls Do Not Discriminate Against Interstate Commerce

A toll discriminates against interstate commerce only if it "impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State." *Selevan I*, 584 F.3d at 95 (quoting *C&A Carbone, Inc.* v. *Town of Clarkstown*, 511 U.S. 383, 390 (1994)).  The party challenging the toll bears the burden of specifically identifying both an "in-state commercial interest that is favored" by the toll and an "out-of-state competitor" that is harmed by it.  *See Selevan I*, 584 F.3d at 95.  Only if the plaintiff is able to specifically identify those interests does "the burden shift[] to the government to show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests."  *Town of Southold* v. *Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007).

The tolls at issue here are clearly not discriminatory.  Plaintiffs can identify neither an in-state economic interest that benefits from the TBTA tolls, nor an out-of-state competitor that is harmed by them.  Nor do plaintiffs contend that the TBTA tolls were "enacted for the purpose of discriminating against out-of-state interests." *Southold*, 477 F.3d at 48 (noting that motivation to "address a growing traffic problem" augured against a finding of discrimination).  Like the tolls upheld by the Third Circuit in *Wallach* v. *Brezenoff*, the tolls at issue here are applicable to New York residents and non-New York residents alike.  930 F.2d 1070, 1072 (3d Cir. 1991).[4]

---

[4]    Although drivers whose E-ZPass tag has been issued by the New York E-ZPass Customer Service Center ("NYCSC") are eligible for a lower toll rate, "[a]nyone, regardless of residency, can apply for a New York Customer Service Center-issued E-ZPass tag."  (Herzog Decl., Ex. 5 (Crossing Charges).)  Indeed,  plaintiff Angus Partners has an E-ZPass account with the NYCSC, even though the Company is based in Florida.  (Herzog Decl., Ex. 21 (Baratz Tr.) at 6-7, 29-30.)  Conversely,

Professor Kenneth Small, a transportation economist who is one of defendants' experts in this case, has analyzed the impact of the MTA's integrated transportation network on interstate commerce.  Professor Small concluded that the TBTA tolls do not discriminate against interstate commerce, and that the effect of the toll structure "on interstate commerce . . . is a positive rather than a negative one."  (Herzog Decl., Ex. 6 (Small Report) at 17.)  His opinion on this issue is unrefuted, as plaintiffs have offered no expert.  And plaintiffs have made no showing that the TBTA tolls have prevented them from engaging in interstate commerce.  Indeed, plaintiffs concede that they continue to use the TBTA's facilities despite the allegedly unconstitutional tolls and, even though they are aware of free alternate routes, they use the TBTA's facilities out of "convenience," or because the route is more "direct" or to avoid traffic.  (Herzog Decl., Ex. 21 (Baratz Tr.) at 50-52, 56-57; Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 20, 23-29, 89-90.)  The TBTA tolls thus simply do not implicate the kind of "economic protectionism" that constitutes discrimination against interstate commerce.  *See McBurney*, 133 S. Ct. at 1719.

---

plaintiff White Crane Martial Arts opened its E-ZPass account in Massachusetts, even though all of the company's employees are based in New York.  (Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 5, 12, 32, 83; Herzog Decl., Ex. 23 (Ester Kelen Tr.) at 22.)

In addition, defendants note that the TBTA does make toll discounts available to residents of certain geographically isolated areas (Staten Island, the Rockaways, and Broad Channel) to travel over the bridges connecting their region to the rest of the City (the Verrazano-Narrows, and the Cross Bay and Marine Parkway Bridges).  Those resident discounts, however, are not at issue in this action, and are the subject of a separate action now pending before Judge Engelmayer, *Janes* v. *TBTA*, 06 Civ. 1427 (PAE) (HBP).

**B.**     **The TBTA Tolls Satisfy the First**
         **Two Prongs of the *Northwest Airlines* Test**

In the absence of a showing of discrimination, a toll policy does not

violate the dormant Commerce Clause if the toll "(1) is based on some fair approximation

of the use of the facilities, [and] (2) is not excessive in relation to the benefits conferred."

*Selevan I*, 584 F.3d at 96.  The Second Circuit has emphasized "that there need not be a

perfect fit between the use of the [toll facility] and the support of [the toll facility] by the

toll" and that "[t]he *Northwest Airlines* test is not inflexible; it simply requires

'reasonableness.'"  *Id.* at 98 (internal quotation marks omitted).  Because the tolls

charged to travelers who cross TBTA facilities are "based on some fair approximation of

the use of the facilities" and are not "excessive in relation to the benefits conferred," they

satisfy the *Northwest Airlines* test.

Plaintiffs' argument appears to be that the TBTA tolls do not represent a

fair approximation of the use of the TBTA facilities and are excessive in relation to the

benefits conferred because some of the toll revenue from the TBTA facilities is used to

support what they call "operations, projects and initiatives unrelated to those facilities."

(Compl. ¶ 1.)  Plaintiffs elaborate that position in two ways.  First, plaintiffs complain

that TBTA revenues are used to support mass and commuter transit generally.  Second,

plaintiffs complain that TBTA toll revenues are used or were used to support several

specific programs, including the Student MetroCard program, Long Island Bus (prior to

termination of its operations), MTA Bus, and Arts for Transit.  Neither argument has

merit.

Plaintiffs' principal argument is that TBTA revenues are used, pursuant to

statute, to support certain public transit and commuter rail portions of the MTA integrated

transportation system, which facilitates transportation in the New York region.  (N.Y. Pub. Auth. Law §§ 552(2), 553(9), (12), (17), 569-c, 1219-a, 1269(1)(a), (10), 1270-d, 1277-a; Herzog Decl., Ex. 4 (Johnson Tr.) at 116-17.)  The record is uncontroverted, however, that the MTA and its affiliates and subsidiaries operate a functionally integrated transportation system.  (Herzog Decl., Ex. 2 (Moss Report) at 42-44; Herzog Decl., Ex. 6 (Small Report) at 16, 20.)  Drivers benefit significantly from the fact that a majority of travelers in the region move using the subways, commuter railroads, and bus services operated by certain of MTA's affiliates and subsidiaries.  *Id.*  Those benefits to drivers include a reduction in traffic on bridges and tunnels.  *Id.*

In fact, the MTA was created for the very purpose of developing and implementing this integrated transportation system.  When the TBTA became an MTA affiliate in 1968, the New York legislature explained that allowing the MTA Board to oversee the TBTA's operations would enable the MTA to provide the New York region with a "unified mass transportation policy"—one in which TBTA revenues were used to support public transportation.  (N.Y. Pub. Auth. Law §§ 552(2), 553(9), (12), (17), 569-c, 1219-a(2)(b), 1264, 1269(1)(a), (10), 1270-d; Herzog Decl., Ex. 2 (Moss Report) at 26; Herzog Decl., Ex. 6 (Small Report) at 5.)

The integrated bridge, tunnel, public transit and commuter rail system has numerous benefits for drivers.  As Judge Korman noted twenty years ago in *Molinari*, "vehicular traffic would grind to a halt without the commuter rail, subway and bus lines that serve New York City and its suburbs."  838 F. Supp. at 719; *see also Auto. Club of N.Y., Inc.* v. *Port Auth. of N.Y. & N.J.*, 887 F.2d 417 (2d Cir. 1989) (recognizing functional integration of multi-modal transportation system); *Wallach*, 930 F.2d at 1070-

71 (adopting reasoning of *Automobile Club*).  By providing travelers with an alternative

to vehicular transportation over the TBTA facilities and connecting roadways, the mass

transit and commuter rail options provided by the MTA's affiliates and subsidiaries allow

traffic to move over those crossings with relatively few delays.  (*See* Herzog Decl., Ex. 6

(Small Report) at 16, 20 (absent public transportation options, "the road facilities would

be overwhelmed by demand far exceeding their capacities" and the mass transportation

system "diverts numerous travelers in the region from the roadways . . . and makes it

possible for users of the roadways to travel without excessive road congestion"); Herzog

Decl., Ex. 2 (Moss Report) at 42-44 (encouraging travelers who have the option of

driving to choose public transit reduces bridge congestion); *id.* at 64-65 (detailing effects

of transit disruptions caused by Superstorm Sandy on road congestion); Herzog Decl.,

Ex. 9 (MTATBTA-A 2884) at MTATBTA-A 2889 ("Given the interdependence of the

highway and transit networks, a decline in transit service quality can be expected to result

in increased use of the already over-burdened highway network, without any practical

means to provide additional road capacity."); *id.* at MTATBTA-A 2892-93 (documenting

increased congestion as result of December 2005 Transit strike).)  Even plaintiff White

Crane admitted that if subway service were disrupted, subway riders "would have to

either drive or walk" (Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 59) and expressed a

preference for "travel[ing] along a route that has less traffic rather than more" (Herzog

Decl., Ex. 22 (Edgar Kelen Tr.) at 26).

Drivers over TBTA facilities also benefit from access to an economically

vibrant city, whose economic vibrancy is made possible by the functionally integrated

transportation system in the New York metropolitan area.  (*See* Herzog Decl., Ex. 6

(Small Report) at 20-21 ("[T]he users of the bridges are receiving the benefits of the regional agglomeration in the New York region, made possible by the integrated transportation system that the bridges and tunnels are part of.  That agglomeration makes the region substantially more productive economically, resulting in increased economic activity, including wage rates, and makes possible the enormous cultural and other benefits available (and in some cases, only available in the New York region.)"); Herzog Decl., Ex. 2 (Moss Report) at 57 ("The services provided by the MTA and its affiliates make possible the significant density of economic activity that characterizes the New York metropolitan area. . . ."). Indeed, plaintiff White Crane admitted that the mass transit system is "pretty important" to New York City and that, when it works well, it helps the City "operate and be what it is." (Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 75-76.)

As the Third Circuit has recognized, an integrated transportation system in which toll revenues are used to support other facilities within the system can satisfy the requirements that tolls  represent a fair approximation of use, and that tolls not be excessive in relation to the benefits.  *Wallach*, 930 F.2d at 1071-72.  In fact, the use of TBTA toll revenue to subsidize certain transit and commuter rail systems operated by MTA's affiliates and subsidiaries with their resulting benefits is analogous to the use of fees charged to embarking commercial airline passengers in *Evansville-Vanderburgh Airport Authority District* v. *Delta Airlines, Inc.*, 405 U.S. 707 (1972).  The *Evansville* Court concluded that those commercial airline passengers reasonably bore that share of airport costs because it was they who enjoyed the principal benefit of "facilities built primarily to meet [their] needs."  *Id.* at 718-19.  The Court found this to be so even

20

though airline passengers did not use every facility located anywhere in the airport (for example, V.I.P. passenger lounges) because the benefit derived from having the entire airport operating made a fee based on airline traffic into the airport reasonable.  *Id.*; *see also Bridgeport & Port Jefferson Steamboat Co.* v. *Bridgeport Port Authority*, 567 F.3d 79, 86 (2d Cir. 2009) (interpreting *Evansville*).  Similarly, in *Alamo Rent-a-Car, Inc.* v. *Sarasota-Manatee-Airport Auth.,* 906 F.2d 516 (11th Cir. 1990), the operation of an airport provided a benefit to a car rental company located nearby, and the Eleventh Circuit therefore rejected the company's claim that it should be charged only for use of the road leading from its location to the airport.  *See id.* at 519.

In contrast, the Second Circuit in *Bridgeport* found that a fee charged to ferry passengers was not based on a fair approximation of their use and was excessive in relation to the benefits conferred on them where the fee was used to support virtually the entire operating budget of the Bridgeport Port Authority ("BPA").  The court in *Bridgeport* explicitly approved the premise that "there need not be a perfect fit between the use of the facilities and the support of those facilities by the fee."  567 F.3d at 86. The court found, however, that "the discrepancy here exceeds permissible bounds."  *Id.* The BPA is a quasi-governmental entity charged with fostering economic development in a geographic area known as the Port District, much of which is entirely unrelated to transportation.  *Id.* at 81, 86-88.  The Second Circuit observed in distinguishing *Evansville* and *Alamo Rent-a-Car* that "[t]he BPA is a governmental unit created to accomplish a variety of tasks, only some of which afford actual or potential benefits to ferry passengers."  *Id.* at 87.  The City of Bridgeport's Municipal Code "broad[ly] defin[ed]" the BPA's purposes, which included "to foster and stimulate the shipment of

freight and commerce through the ports," "to develop and promote port facilities with the district in order to create jobs, increase the city's tax base and provide special revenues to the city," and to work with the City "to maximize the usefulness of available public funding." *Id.* at 81.

The contrast between the BPA's and the MTA's purposes and the fees charged by the BPA and TBTA tolls could not be more stark. The MTA is solely charged with "develop[ing] and implement[ing] a unified mass transportation policy for [the metropolitan commuter transportation] district." N.Y. Pub. Auth. Law § 1264. The TBTA is expressly authorized by the legislature to use its tolls, after payment of TBTA bond obligations (including obligations arising from bonds used to fund NYCTA, MNR and LIRR capital projects), and after payment of operating, administration, and other necessary expenses, to provide financial assistance to NYCTA and the commuter railroads for implementation of the MTA's mandated "uniform transportation policy." N.Y. Pub. Auth. Law §§ 552(2), 553(9), (12), (17), 569-c. Nearly all expenditures funded by TBTA's tolls are thus directly related to the development and implementation of an integrated transportation network for the benefit of the users of that network. For that reason, the toll charges reflect a fair approximation of the use of the facilities at issue and are not excessive in relation to the benefits conferred.

Plaintiffs also argue that it is improper to use TBTA revenues to support several specific programs, which they contend are allegedly "operations, projects and initiatives" that are unrelated to the TBTA facilities. They identify Student MetroCard, Arts for Transit, MTA Bus, and Long Island Bus before termination of its operations, as such programs. This argument fails for several reasons.

*First*, these programs are each a part of the integrated transportation system operated by the MTA and its affiliates and subsidiaries.  It does not matter whether drivers crossing TBTA facilities benefit from each specific piece of the integrated transportation system TBTA revenues are used to support; what matters is that they benefit from the operation of the integrated transportation system *as a whole*.  As the Second Circuit observed in interpreting *Evansville*, "although the airlines did not use every facility located anywhere in the airport (for example, the lounges for v.i.p. airlines passengers), the benefit derived *from having the entire airport operating* made a fee based on airline traffic into the airport reasonable."  *Bridgeport*, 567 F.3d at 86 (emphasis added) (discussing *Evansville*, 405 U.S. at 718-19).  As described above, drivers here likewise receive a benefit from having the entire integrated transportation system operating.

The Supreme Court in *Evansville* was concerned about the implications of scrutinizing too closely the policy decisions made by states in setting toll rates.  The Court explained:

> Complete fairness would require that a state tax formula vary with every factor affecting appropriate compensation for road use.  These factors, like those relevant in considering the constitutionality of other state taxes, are so countless that we must be content with rough approximation rather than precision.  Each additional factor adds to administrative burdens of enforcement, which fall alike on taxpayers and government.  We have recognized that such burdens may be sufficient to justify states in ignoring even such a key factor as mileage, although the result may be a tax which on its face appears to bear with unequal weight upon different carriers.

*Evansville*, 405 U.S. at 716 (citation and internal quotation marks omitted) (quoting *Capitol Greyhound Lines* v. *Brice*, 339 U.S. 542, 546-47 (1950)).  To avoid such a burdensome and intrusive inquiry, the Court has held that a showing of "[c]omplete fairness" is not required for a toll policy to be upheld as constitutional.  *Evansville*, 405

23

U.S. at 716.  The Second Circuit has similarly emphasized "that there need not be a perfect fit between the use of the [toll facility] and the support of [the toll facility] by the toll" and that "[t]he *Northwest Airlines* test is not inflexible; it simply requires 'reasonableness.'"  *Selevan I*, 584 F.3d at 98 (internal quotation marks omitted).

Under these cases, it is not appropriate for a court to scrutinize each and every programming or spending decision an agency makes.  The use of TBTA revenues to support programs such as Student MetroCard, Arts for Transit, MTA Bus, and Long Island Bus (before termination of its operations) would be appropriate because these programs are part of the larger integrated transportation network operated by the MTA and its affiliates and subsidiaries from which drivers over TBTA facilities benefit.  The decision, for example, to provide discounted MetroCards to students is well within the discretion of the MTA and NYCTA, and is no different from the policy of providing half-fare MetroCards to senior citizens and disabled people.  (Herzog Decl., Ex. 19 (Reduced-Fare MetroCards).)  Nothing about plaintiffs' claims provides this Court with either a reason, or the authority, to substitute its judgment for that of the managers of the public transit system to adjust or eliminate toll discounts provided to students, seniors, and the disabled.

*Second*, drivers using the bridges and tunnels do in fact benefit from the programs discussed here.  MTA Bus and Long Island Bus, like the subways, NYCTA buses, and the commuter rail system, divert to public transit travelers who would otherwise drive, reducing traffic and congestion on the roadways, bridges and tunnels.  (*See supra* at 18-20.)  Arts for Transit makes traveling by public transit and commuter rail more appealing, and thus encourages travelers to use public transportation.  And the

Student MetroCard program induces students to travel by public transit.  Without Student MetroCards, students would have to find alternative means of transportation.  This might result in school systems providing alternative transportation, such as additional school buses that would clog the roadways, or in students who did not wish or could not afford to pay the full fare traveling by car or private bus.[5]  (*See* Herzog Decl., Ex. 4 (Johnson Tr.) at 67.)

> *Third*, plaintiffs are wrong, as a matter of fact, that TBTA toll revenues are used to fund most of these programs.  Neither MTA Bus nor Long Island Bus (before termination of its operations) was funded with TBTA toll revenues.  The MTA Director of the Division of Management and Budget has testified that no TBTA revenues are used to support MTA Bus, or were used to support Long Island Bus before termination of its operations and privatization of bus service in Nassau County.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 136-37.)[6]  This testimony is uncontroverted.  Nor are TBTA toll revenues used to support Arts for Transit's operations.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 104-06, 136-37)  And even with respect to the Student MetroCard program, the costs incurred are almost all in the nature of foregone revenue, not out-of-pocket expenditures, as the ongoing costs of operating the subway and bus system would be incurred regardless of the fares charged students.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 24-25, 69-70; Herzog Decl., Ex. 3 (Ring Tr.) at 38.)  The amount of that foregone revenue is relatively small; after State and City reimbursements, it makes up just over 1%

---

[5]   These programs also provide more direct benefits to some TBTA toll-payers.  The principals of plaintiff White Crane, for example, have children who receive Student MetroCards.  (Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 58.)

[6]   TBTA revenues are also not used to fund MTA headquarters or Staten Island Railway.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 92-93; Herzog Decl., Ex. 14 (Johnson Ex. 3); Herzog Decl., Ex. 3 (Ring Tr.) at 57-58.)

of the MTA's annual operating budget—a number that would in reality be even smaller, if the program were discontinued, since some students would walk or be driven to school rather than use mass transit.  (Herzog Decl., Ex. 4 (Johnson Tr.) at 64, 67; Herzog Decl., Ex. 18 (Johnson Ex. 2); Herzog Decl., Ex. 20 (The MTA Network—version accessed October 2, 2012).)

### III.    The TBTA Tolls Do Not Violate the Right to Travel

The TBTA tolls also do not violate the plaintiffs' right to travel.  "[A] state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right."  *Selevan I*, 584 F.3d at 100 (quoting *Att'y Gen. of N.Y.* v. *Soto-Lopez*, 476 U.S. 898, 903 (1986)).  By contrast, "minor burdens impacting interstate travel, *such as toll roads*, do not constitute a violation of [the right to travel]."  *Miller*, 176 F.3d at 1205, *quoted with approval in and emphasis added by Selevan I*, 584 F.3d at 101; *see also Weisshaus* v. *Port Auth. of N.Y. & N.J.*, 497 F. App'x 102, 104 (2d Cir. 2012) ("[T]ravelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right.").  That is so because, as the Supreme Court has recognized, "'[t]he principle that burdens on the right to travel are constitutional only if shown to be necessary to promote a compelling state interest has no application' where travelers pay a fee to use a 'facility provided at public expense [that] aids rather than hinders the right to travel.'"  *Selevan I*, 584 F.3d at 101 (quoting *Evansville*, 405 U.S. at 714).  Plaintiffs do not allege that "impeding travel" is the "primary objective" of the TBTA tolls.  Nor do the tolls "actually deter" travel or "exact a penalty against those who wish to exercise their constitutional right to travel."  (*See* Compl. ¶ 108.).  *See Town of Southold* v. *Town*

*of East Hampton,* 477 F.3d 38, 53-54 (2d Cir. 2007) (rejecting argument that law regulating ferries "actually deterred" travel or exacted a "penalty" where passengers could complete trip using a different mode of transportation).

Here, the only evidence on these issues in the record shows that the plaintiffs continue to use the TBTA facilities, even though they are aware of free alternate routes, out of "convenience" or because the route is more "direct" or to avoid traffic.  (Herzog Decl., Ex. 21 (Baratz Tr.) at 50-52, 56-57; Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 20, 23-29, 89-90.)  Plaintiff White Crane testified that his decision as to which route to take was affected only "[s]lightly" by the fact that one alternative had a toll.  (Herzog Decl., Ex. 22 (Edgar Kelen Tr.) at 28.)

The case law is clear that the financial burden borne by users paying tolls such as the ones at issue here constitutes a "minor restriction" on the right to travel and *not* a penalty.  The Second Circuit recently upheld, on the grounds that they constituted a "minor restriction[ ]" on travel, the dismissal of a right to travel challenge to the Port Authority's tolls—which are similar to the TBTA tolls in that toll revenues are used to subsidize other aspects of the Port Authority's integrated transportation network. *Weisshaus*, 497 F. App'x at 104.  As to amount, the tolls charged to customers of the NYCSC to cross the Marine Parkway and Cross Bay Bridges—$2.00—and to cross the Henry Hudson Bridge—$2.44—are well within the range of the tolls at issue in other recent cases.  (Herzog Decl., Ex. 5 (MTA Crossing Charges); *see Selevan III*, 711 F.3d at 255 ($1.00 nonresident toll); *Wallach*, 930 F.2d at 1070 ($3.00 toll); *Surprenant*, 2010 WL 785306, at *2 n.5 ($3.50 nonresident toll); and *Kelen* v. *Mass. Tpk. Auth.*, 2007 WL 1418510, at *1 (Mass. Super. Ct. May 3, 2007) ($2.50 nonresident toll).  Likewise,

27

the toll for NYCSC E-ZPass customers over the remaining TBTA bridges and tunnels is

only $5.33 each way (although the round-trip toll is collected one-way on the Verrazano-

Narrows Bridge, as required by federal law), and is close to the tolls at issue in those

cases.  (Herzog Decl., Ex. 5 (MTA Crossing Charges).)

    The Second Circuit has left open the possibility that a toll structure could

conceivably implicate the right to travel as contemplated by the Supreme Court in

*Evansville*.  *Selevan I*, 584 F.3d at 101-02.  In *Evansville*, the Supreme Court

differentiated between taxes which create "invidious distinctions" that penalize the right

to travel, and fees "designed only to make the user of state-provided facilities pay a

reasonable fee to help defray the costs of their construction and maintenance."  *Selevan I*,

584 F.3d at 102 (construing *Evansville*, 405 U.S. at 713-14); *see also Selevan* v. *N.Y.*

*Thruway Auth.*, 2011 WL 5974988, at *6 (N.D.N.Y. Nov. 28, 2011) (same).  While the

former may implicate the fundamental right to travel, the latter constitute minor

restrictions on travel not implicating the fundamental right and thus need only satisfy the

*Northwest Airlines* test.  *Selevan III*, 711 F.3d at 258; *Selevan II*, 2011 WL 5974988, at

*6 (citing *Selevan I*, 584 F.3d at 101-02).

    For the reasons stated above, the TBTA tolls constitute a reasonable user

fee designed to defray the costs of maintenance and construction of the integrated

transportation system of which the TBTA facilities are a part, and from which the drivers

who pay tolls benefit.  *See supra* Part II.  Strict scrutiny does not apply, and under Second

Circuit precedent, the legality of the toll policy hinges on the application of the *Northwest*

*Airlines* test.  Because the toll policy does not run afoul of the *Northwest Airlines*

standard, *see supra* Part II, it does not violate the Privileges and Immunities Clause of

Article IV, or the Privileges or Immunities, Equal Protection, or Due Process Clauses of the Fourteenth Amendment.

## IV.      Plaintiffs' Common-Law Claims under New York Law Have No Merit

Finally, plaintiffs have asserted claims under the common law of New York for unjust enrichment and for money had and received.  (*See* Compl. ¶¶ 128-34.) To prevail on a claim of unjust enrichment, plaintiffs must show that: "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Anesthesia Assocs. of Mt. Kisco, LLP* v. *N. Westchester Hosp. Cntr.*, 59 A.D.3d 473, 481 (N.Y. App. Div. 2d Dep't 2009) (internal quotation marks omitted).  Here, plaintiffs allege unjust enrichment "[b]y virtue of [defendants'] obtaining monies in connection with their practices which are unconstitutional under the United States Constitution." (Compl. ¶ 129.)  Similarly, a cause of action for money had and received arises "when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another."  *Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist.* v. *Rettaliata*, 576 N.E.2d 716, 719 (N.Y. 1991).  Here, plaintiffs allege that "Defendants charged tolls, or caused the charging of tolls, to Plaintiffs and other members of the Class in an amount that Defendants were not legally entitled to, and by doing so Defendants collected or received money belonging to Plaintiffs and other members of the Class to which Defendants were not entitled."  (Compl. ¶ 133.)  Because recovery on plaintiffs' New York common-law claims depends upon a showing that defendants' toll policies are otherwise unlawful, summary judgment should be granted to defendants on these claims for the reasons stated above.

**Conclusion**

Defendants' motion for summary judgment should be granted and summary judgment dismissing the Complaint with prejudice should be entered.

Dated:  New York, New York
September 27, 2013

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   _s/ Walter Rieman_____
Leslie Gordon Fagen (lfagen@paulweiss.com)
Walter Rieman (wrieman@paulweiss.com)
Steven C. Herzog (sherzog@paulweiss.com)
Joshua D. Kaye (jkaye@paulweiss.com)
Melissa C. Monteleone (mmonteleone@paulweiss.com)
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants*