# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGUS PARTNERS LLC d/b/a ANGUS ENERGY, and WHITE CRANE MARTIAL ARTS, INC., individually and on behalf of all others similarly situated, | Case No. 11-CV-0039 (AT) |
| Plaintiffs, | |
| -against- | |
| JAY WALDER, individually and in his official capacity, JAMES FERRARA, individually and in his official capacity, METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY  d/b/a MTA BRIDGES AND TUNNELS, | |
| Defendants | |

### Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment

Brian L. Bromberg
Jonathan R. Miller
Bromberg Law Office, P.C.
40 Exchange Place, Suite 2010
New York, NY 10005
Tel: (212) 248-7906
Fax: (212) 248-7908

Harley J. Schnall
711 West End Ave
New York NY 10025
Tel: (212) 678-6546
Fax: (212) 678-0322

**Attorneys for Plaintiffs**

# Table of Contents

I.   Preliminary Statement   .   .   .   .   .   .   .   1

II.  Statement of Facts   .   .   .   .   .   .   .   .   2

III. Argument   .   .   .   .   .   .   .   .   .   6

    A.   Standard of Review.   .   .   .   .   .

                                                    6

    B.   The toll pricing for TBTA bridges and tunnels is subject to constitutional review under the three-part *Evansville Northwest Airlines* test.   .   .   .   6

        1. The toll pricing is not based on a fair approximation of the use of the facilities.   .   9

            a. The exorbitant surplus and margin associated with the toll collection constitutes a grossly unreasonable levy on motorists.   .   .   .   9

            b. Shifting the costs of the predominant class of facilities onto the users of a different and much smaller class of facilities is patently unfair.   .   .   .   10

        2. The tolls collected are excessive in relation to the benefits conferred.   .   .   .   .   12

            a. There is no "integrated transportation system" from which motorists benefit.   .   12

               (i) The commuter railroads.   .   .

               (ii) The New York City Transit Authority   .   .   .   .   14

            b. The tolls are excessive because certain MTA funds go to projects and initiatives that confer no qualifying benefit on   .   14

i

TBTA facility users.   .   .   .

3.   The variable toll pricing discriminates
      against interstate commerce.   .   .
                                                      .   17


                                                      .   21

IV.   Conclusion   .   .   .   .   .   .   .
                                                          23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Auto Club of N.Y., Inc. v. Port Auth. of N.Y. and N.J.,*
  887 F.2d 417 (2d Cir. 1989) ...................................................................15

*Ben Oehrleins & Sons & Daughters, Inc. v. Hennepin County,*
  115 F.3d 1372 (8th Cir.1997).....................................................................7

*Bridgeport and Port Jefferson Steamboat Company v. Bridgeport Port
  Authority,*
  567 F.3d 79 (2d Cir. 2009), *cert. denied,* 130 S. Ct. 1075 (2010) .............*passim*

*C & A Carbone, Inc. v. Town of Clarkstown,*
  511 U.S. 383 (1994)..........................................................................22, 23

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..................................................................................6

*Doran v. Massachusetts Turnpike Authority,*
  348 F.3d 315 (1st Cir. 2003) ...................................................................23

*Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,*
  405 U.S. 707 (1972)............................................................................9, 10

*Grand River Enters. Six Nations. Ltd. v. Pryor,*
  425 F.3d 158 (2d Cir.2005) ........................................................................7

*Kassel v. Consolidated Freightways Corp. of Del.,*
  450 U.S. 662 (1981)....................................................................................7

*New Energy Co. of Ind. v. Limbach,*
  486 U.S. 269 (1988)........................................................................1, 22, 23

*Northwest Airlines, Inc. v. County of Kent,*
  510 U.S. 355 (1994).............................................................................*passim*

*Selevan v. N.Y. Thruway Auth.,*
  711 F.3d 253 (2d Cir. 2013) ...................................................................20

*Selevan v. New York Thruway Authority,*
  584 F.3d 82 (2d Cir. 2009) ....................................................................7, 8

*Terry v. Ashcroft,*
  336 F.3d 128 (2d Cir. 2003) .....................................................................6

iii

*Wallach v. Brezenoff,*
    930 F.2d 1070 (3d Cir. 1991) ............................................................................15

**Statutes**

N.Y. Ed. L. Sec. 3635 ............................................................................................18

**Other Authorities**

Federal Rule of Civil Procedure 56 ........................................................................6

*Opinion of Justices to the House of Representatives,* 428 Mass. 1201, 1204,
    702 N.E.2d 8 (1998) ...........................................................................................7

U.S. Const. Art. I, § 8 .................................................................................*passim*

## I.  Preliminary Statement

"It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988) (citations omitted). At issue in this case are the discrimination and burden worked upon interstate commerce by Defendants' unreasonable and excessive user fees.

Defendant MTA, through its affiliate, Defendant TBTA, charges motorists using bridge and tunnel facilities toll rates that far exceed the cost of operating and maintaining those facilities. Under color of authority granted by the New York State Legislature, the TBTA then transfers hundreds of millions of dollars in operating surpluses to the MTA, which in turn distributes the funds to other budgetary uses. More specifically, those funds wind their way to different units that operate throughout the vast New York City metropolitan area, serving different – and far larger – populations than those who use the bridges and tunnels.

The entities that benefit from these siphoned-off funds include New York City Transit Authority, which principally operates local buses, longer-range express buses and subway trains within the city; Metro-North Railroad, which operates a commuter railroad network that extends deep into northern suburban counties and into Connecticut; and Long Island Rail Road, another commuter railroad network that extends deep into Nassau and Suffolk Counties. The work of these agencies is

1

fundamentally different and separate from the work of the TBTA. The mega-entity called the MTA may be a politically expedient means of funding what are, admittedly, vital mass transit projects – but that has no bearing on the constitutional question presented here. What does matter here is that, contrary to Defendants' arguments, the MTA is anything but an "integrated public transportation system."

Defendants argue that there is no genuine issue of material fact – and Plaintiffs agree. None of the facts here are disputed. Neither is there any disagreement as to the applicable legal standard under current Second Circuit law. What the parties do disagree on is how to apply that legal standard to the undisputed facts. As more fully explained below, the MTA's practice of setting excessive tolls to generate huge surpluses at the expense of a fraction of its customers, then directing those surpluses to subsidize its various initiatives elsewhere within the wider region, violates the Dormant Commerce Clause and Plaintiffs' right to travel. Plaintiffs therefore respectfully ask this Court to deny Defendants' Motion for Summary Judgment and, instead, to grant Plaintiffs' Cross-Motion for Summary Judgment.

## II.    Statement of Facts

The busy New York City metropolitan area is host to a number of transportation services, each of which is designed to meet different transportation needs. *See* Declaration of Steven C. Herzog, dated Sept. 27, 2013 ("Herzog Decl."),

Ex. 6 (Small Expert Report) at 5. Defendant MTA consists of several subsidiaries and affiliates that each operates transportation services in some portion of a sprawling region including a 12-county district (the "District") in southeastern New York State and two counties in southern Connecticut. (Herzog Decl., Ex. 1 (The MTA Network).) The TBTA, an affiliate of the MTA, principally operates only nine water-crossing facilities, all of which are bridges and tunnels strictly within the five counties, or boroughs, of New York City. (*Id.*) Other entities under the MTA umbrella – New York City Transit Authority ("NYCTA"), Long Island Rail Road ("LIRR") and Metro-North Railroad ("MNR") – fund and operate extensive subway, bus and commuter rail systems together encompassing several thousand miles of train tracks and bus routes, with some of their tracks and stations linking far-flung communities dozens of miles from New York City's borders. (*Id.*)

But though the MTA's tentacles are many and far-reaching, it is not the sole public provider of transportation services in the region. There are several other public entities that fund and operate significant transportation services and facilities for millions of travelers within the district, as well as into and out of the district.

Within New York City alone, there are several such entities providing mass transit services to tens of millions of travelers. The entity known as MTA Bus, one of the largest transit agencies in the country, is operated by the MTA but is principally funded by New York City; it served over 100 million passengers at a cost of $292 million to the city in 2011. (Herzog Decl. Ex. 1 (The MTA Network));

(Schnall Decl., Ex. A). Annually, about 20 million other public transit passengers travel between Staten Island and Manhattan via the Staten Island Ferry, which is principally funded and operated by New York City's Department of Transportation. (Schnall Decl., Ex. B).Additionally, in the suburban New York counties surrounding New York City, local bus systems serving millions of other passengers annually are funded not by the MTA but by local governments; these entities include the Bee-Line in Westchester County, Suffolk County Transit, and NICE in Nassau County (the successor to MTA Long Island Bus, which before 2012 operated bus service in Nassau County and had been funded in part by the MTA). (Schnall Decl., Ex. C).

A number of state and local public entities also fund and maintain bridge and road facilities in the District. There are more bridges connecting Manhattan to the other boroughs that are operated and funded by New York City than there are such connecting bridges and tunnels operated and funded by the TBTA. (Schnall Decl., Ex. D).While there are only about 21 miles of TBTA facilities for motorists, there are hundreds of miles of other highways and roads in New York City that are not operated or funded by the TBTA. (Schnall Decl., Ex. E at 34, F).There are also tolled roads and bridges elsewhere in the District that are operated by public authorities unrelated to the MTA, including the New York State Thruway Authority and the New York Bridge Authority. (Schnall Decl., Ex. G, H). In total, the vast majority of the other tolled and non-tolled roads, highways and bridges in New York City and in the wider District – thousands of miles' worth – are maintained and funded by political subdivisions that are not MTA-related entities. (Schnall Decl., Ex. I, J, K).

4

TBTA currently collects, in aggregate, about $1.5 billion in tolls from motorists using TBTA bridge and tunnel facilities – approximately 2.5 times the amount actually needed to operate those facilities. (Herzog Decl., Ex. 7 at 12.). As such, about 60 cents of every toll dollar goes to pay for non-TBTA items in the MTA budget. This budget, which in 2012 was at about $12.6 billion, gets only about 12% of its funds from TBTA tolls; the bulk of the funds, about 84%, comes from two non-toll sources: mass transit passenger fares, and dedicated payments from state and local government sources, mainly tax transfers. (Schnall Decl., Ex. L (July 2011 Plan) at 6.).Further, the number of annual motorist trips on MTA-related facilities is similarly dwarfed by the number of annual passenger trips on MTA-related facilities: for every motorist there are at least nine mass transit users. (Herzog Decl., Ex. 1 (The MTA Network).)

As part of its overall budgeting process, the MTA sets TBTA toll rates to meet internal demands for additional revenues to balance its budget, as required under state law. (Schnall Decl., Ex. M). Depending on overall revenue conditions, the MTA has also elected to retrench and contract portions of its vast operations. (*Id.*)Additionally, the MTA has engaged in other discretionary programs that expend funds or forego revenues, some of which it eventually discontinued in response to a shortfall in overall revenues (such as subsidizing local bus service in Nassau County) and some of which it continues to engage in (such as Student Metrocards). (Schnall Decl., Ex. N at 8, 333-338, O at 7).

III.    Argument

    **A. Standard of Review**

Under Federal Rule of Civil Procedure 56, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party must point to evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials," Fed.R.Civ.P. 56(c)(1)(A), which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In determining whether there are genuine issues of material fact, . . . [courts are] required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 395 (2d Cir. 1997)). Summary judgment may only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Id.* (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 685 (2d Cir. 2001)).

    **B. The toll pricing for TBTA bridges and tunnels is subject to constitutional review under the three-part *Evansville-Northwest Airlines* test**

The United States Constitution reserves for Congress the right to regulate

commerce between the States. U.S. Const. Art. I, § 8. "In implementing the Commerce Clause, the Supreme Court has adhered strictly to the principle that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate or restrain it." *Selevan v. New York Thruway Authority*, 584 F.3d 82, 90 (2d Cir. 2009) (internal quotation marks omitted). This limitation on states' authority to regulate interstate commerce is referred to by courts as the "dormant Commerce Clause." It is true that the Supreme Court has recognized that "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Kassel v. Consolidated Freightways Corp. of Del.*, 450 U.S. 662, 669 (1981). But whatever remains of the states' power to affect interstate commerce is limited.

State law or policy violates the dormant commerce clause when it "clearly discriminates against interstate commerce in favor of intrastate commerce" or "if it imposes a burden on interstate commerce incommensurate with the local benefits secured." *Grand River Enters. Six Nations. Ltd. v. Pryor,* 425 F.3d 158, 168 (2d Cir.2005). The dormant commerce clause is designed to "prevent economic protectionism and retaliation between states and to allow markets to flourish across state borders, thus prohibiting 'laws that would excite ... jealousies and retaliatory measures between the states.' " *Ben Oehrleins & Sons & Daughters, Inc. v. Hennepin County,* 115 F.3d 1372, 1382 (8th Cir.1997), quoting *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390 (1994). *See also Opinion of Justices to the*

*House of Representatives,* 428 Mass. 1201, 1204, 702 N.E.2d 8 (1998) (noting an

"alertness to the evils of 'economic isolation' and protectionism," quoting

*Philadelphia v. New Jersey,* 437 U.S. 617, 623 (1978)).

Fees imposed for using modes or channels of transportation – including, but

not limited to, highway tolls – are a special example of the type of state action that

could burden or discriminate against interstate commerce. The Second Circuit has

held that state-imposed highway tolls ought to be analyzed using the test

articulated by the Supreme Court in *Northwest Airlines, Inc. v. County of Kent*, 510

U.S. 355, 369 (1994). *See Selevan*, 584 F.3d at 98. Courts within the Second Circuit

must strike down as unconstitutional any state-imposed highway toll that does not

meet *each* of the following three criteria: "(1) [the toll] is based on some fair

approximation of use of the facilities, (2) [the toll] is not excessive in relation to the

benefits conferred, and (3) [the toll] does not discriminate against interstate

commerce." *Northwest Airlines,* 510 U.S. at 369, *citing Evansville–Vanderburgh*

*Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17 (1972).

MTA's bridge and tunnel toll pricing must satisfy *all three* prongs of the

*Evansville-Northwest Airlines* test, or else run afoul of the Dormant Commerce

Clause and the constitutional right to travel. *See Bridgeport and Port Jefferson*

*Steamboat Company v. Bridgeport Port Authority*, 567 F.3d 79 (2d Cir. 2009), *cert.*

*denied*, 130 S. Ct. 1075 (2010) (unreasonably high ferry surcharge triggered both

Dormant Commerce Clause and right to travel violations). But, as explained below,

the tolls at issue here satisfy *none* of the three criteria. Consequently, Plaintiffs are

8

entitled to summary judgment, and Defendants' motion ought to be denied.

### 1. The toll pricing is not based on a fair approximation of the use of the facilities

Under the first prong of the *Evansville/Northwest Airlines* test, when a government actor charges an individual or a class of users a fee for using a transportation-related facility, it must undertake to base that charge on a "fair approximation" of that individual's or class's share of the use of those facilities. *Northwest Airlines*, 510 U.S. at 369. To be sure, "some other formula might reflect more exactly the relative use of the state facilities by individual users," but an imperfect estimate is permissible "so long as the toll is based on some fair approximation of use or privilege for use." *Evansville*, 405 U.S. at 716-17. The MTA's toll and fare scheme, however, is not a fair approximation of use – instead, it grossly and unfairly misallocates costs.

### a. The exorbitant surplus and margin associated with the toll collection constitutes a grossly unreasonable levy on motorists

As the record indicates, the TBTA annually collects toll revenues from motorists that result in heavy operating surpluses. (Herzog Decl., Ex. 1 (The MTA Network).) These surpluses are transferred to entities related to the MTA for non-TBTA purposes. (*Id.*) In 2012, the surplus transferred was about $938 million from about $1.5 billion in toll revenues, representing an operating margin of well over 60%. (*Id.*) Put another way, over the relevant period, motorists were charged about 2.5 times what it actually cost to run the TBTA facilities. The majority – approximately 60% – of the toll dollars collected annually at the TBTA water-

9

crossing facilities went not to the operations, maintenance and improvement of those facilities, but to a range of other operations, projects and initiatives of the MTA and its subsidiaries or related entities that range widely in scope and geography.

### b. Shifting the costs of the predominant class of facilities onto users of a different and much smaller class of facilities is patently unfair

Although the law does not demand of government entities complete precision when establishing and allocating transportation user fees, it still requires states to approximate them fairly. For instance, when an airport authority assesses user fees, it may lawfully choose to impose them on just commercial airline passengers – even though there may be many other visitors using the facilities – because the airport operates primarily for that group of users. *See Evansville*, 405 U.S. at 707. Similarly, an airport authority may lawfully choose to allocate the cost of specific portions of its systems and operations only to smaller tenants and exempt the much larger, if the smaller were the direct users of those systems and operations, and the larger  only used other portions of the airport complex. *See Northwest Airlines*, 510 U.S. at 355.

The MTA's pricing of tolls, though, falls far short of a fair, if imperfect approximation. Mass transit facilities and operations constitute the vast majority of the facilities and operations under the control of the MTA. The 2013 operating budget for mass transit was about $13.2 billion – $9.9 billion for NYCTA, $1.7 billion for LIRR, $1.4 million for MNR and $0.7 billion for MTA Bus. (Herzog Decl., Ex. 1. (The MTA Network.). The operating budget for TBTA was under $0.6. (*Id.*)

10

Taken together, mass transit represents over 95% of budgeted operations for transportation under the MTA's purview, and bridge and tunnel operation represents less than 5%. Further, the record reveals that 283 million toll-paying motorists were outnumbered by 2.6 billion fare-paying mass-transit passengers by approximately nine to one. (*Id.*) In other words, roughly 10% of the MTA's customers are made to subsidize the other 90%.

It does not follow that the notion of "imperfect estimates" permitted in the user fee allocations in *Evansville* and *Northwest Airlines* should be extended to permit the MTA's user fee allocations here.  To do so would be to bless a patently unfair scheme in which a relatively small portion of users using a small portion of the system heavily subsidize a large portion of users using the bulk of the system. Yet the MTA is essentially doing the opposite of what the airport operator lawfully did in *Northwest Airlines* : it is allocating the costs of the mass transit system to the nonusers – the motorists.

*Evansville* and *Northwest Airlines* do not counsel that the users of one transportation system may be easily made to subsidize a different transportation system. Rather, they demonstrate that a good-faith effort should be made to match users with the resources they clearly use, and to calculate user fees in proportion to the cost of those resources. See *Northwest Airlines*, 510 U.S. at 370, n. 16. Here, the MTA is intentionally, under color of state law, charging excessive tolls and effectively using those revenues from motorists to further subsidize fares for mass transit passengers that are already heavily subsidized by tax transfers. Schnall

11

Decl., Ex. A. Where, as here, over 60% of a motorist's user fee is siphoned off to pay for resources that the motorist never even uses, clearly the "discrepancy . . . exceeds permissible bounds." *Bridgeport*, 567 F.3d at 86.

### 2. The tolls collected are excessive in relation to the benefits conferred

Under the second prong of the *Evansville /Northwest Airlines* test, a user fee must not be excessive in relation to the benefits conferred. *Northwest Airlines*, 510 U.S. at 355. MTA asserts that the toll pricing satisfies this prong, even with the transfer of heavy TBTA surpluses to mass transit initiatives, because (i) TBTA facilities must be considered together with MTA's mass transit facilities as part of an "integrated transportation system," and (ii) motorists receive the benefit of the reduced traffic in this system. Regardless of whether MTA's assertion that its operations constitute an integrated transportation system is correct, the toll pricing does not satisfy this prong, either.

### a. There is no "integrated transportation system" from which motorists benefit

As an initial matter, MTA's argument fails because there is no integrated transportation system here. MTA subsidiaries operate and fund a broad range of public transportation services in the service region that spans 5,000 square miles. (Herzog Decl., Ex. 1 (The MTA Network).) Cumulatively, those services include thousands of miles of bus and rail routes running to all corners of the 12-county District, and then extending even further, miles into the state of Connecticut. In contrast, the TBTA – an MTA affiliate, not a subsidiary – funds and operates a select group of approximately 21 miles worth of water-crossing facilities for

motorists: seven bridges and two tunnels that are all contained within the five boroughs of New York City. (Schnall Decl., Ex. E) But this mileage constitutes only a very small fraction of the thousands of miles of road facilities funded and maintained by the New York City Department of Transportation, the New York State Department of Transportation, and other public entities in New York City and throughout the rest of the District. (Schnall Decl., Exs. F, I, J, and K). There are even other toll bridge facilities within the District operated by public corporations other than TBTA. (Schnall Decl., Exs. G and H).   Moreover, there are actually more water crossings for motor vehicles traveling between Manhattan and the other boroughs operated and funded by the City than there are TBTA water crossings in all five boroughs. (Schnall Decl., Ex. D). Additionally, a group of six bridge and tunnel facilities operated and funded by the Port Authority of New York and New Jersey annually bring over 80 million motor vehicles into Manhattan and 30 million motor vehicles into Staten Island. (Schnall Decl., Ex. P at 96-97). In short, the New York City metropolitan area is serviced by a hodge-podge of roads and rails, operated by a plethora of government agencies beholden to diverse political interests. There simply is no "integrated transportation system." That the authority that operates the TBTA bridges and crossings is linked at all to the MTA, with its buses and trains is the result of political maneuvering – not rational transportation design.

### (i)    The commuter railroads

Much of the trackage of the LIRR and MNR, as well as the majority of their stations, falls outside the five boroughs – as far away as Montauk,100 miles from the New York city line, and even into Connecticut. (Schnall Decl., Exs. Q, R). On almost every scheduled LIRR and MNR train route, travelers may purchase tickets for travel between a large number of station pairings and not traverse a TBTA water crossing, or, for that matter, even travel within the five boroughs at all. (Schnall Decl., Exs. E, Q, and R). About one-third of scheduled LIRR trains terminate at or originate from Brooklyn's Atlantic Terminal, or other points east of the East River, and thus do not even traverse a TBTA water crossing. (Schnall Decl., Ex. S). Two MNR Lines connect points in northwest suburban New York counties to points in New Jersey, not to New York City, and also do not cross a TBTA water crossing. (Schnall Decl., Ex. R). In sum, because a significant portion of the commuter railroads serve those who are traveling well outside the five boroughs, or those taking an entire trip without crossing a TBTA water crossing, or traveling a significant distance before crossing a TBTA water crossing, their facilities cannot be considered with the TBTA facilities as part of an integrated network.

### (ii)    The New York City Transit Authority

Local bus service, a large component of NYCTA, is devoted, with extremely limited exceptions, to moving people overland within a borough. Schnall Decl. Exs. E, T, U, V, W, X). Moreover, the express bus routes funded by NYCTA do not merely

14

transport passengers between the edge of Manhattan and the edge of one of the other four boroughs, but rather make intermediate stops far from the water crossing on either side to pick up and discharge passengers. (Schnall Decl., Ex. Y). Even the subway network has the vast majority of its over 400 stations, and the majority of its passenger entries, situated at least one stop away from a water crossing, and each of its approximately 20 lines originate and/or terminate miles away from water crossings. (Schnall Decl., Ex. Z).  In sum, because a significant portion of New York City Transit is designed for overland travel, its facilities and TBTA's  facilities cannot be said to form an integrated transportation network.[1]

As MTA would have it, the TBTA facilities and the facilities of the LIRR, MNR and NYCTA should be recognized as an integrated transportation system just like the interstate transportation network of the Port Authority of New York and New Jersey ("PANYNJ") and be granted similar deference with respect to cross-subsidization. *See Auto Club of N.Y., Inc. v. Port Auth. of N.Y. and N.J.*, 887 F.2d 417 (2d Cir. 1989) and *Wallach v. Brezenoff*, 930 F.2d 1070 (3d Cir. 1991). But there were specifics to PANYNJ's facilities that lent itself to such a designation that are

---

[1] Further undercutting MTA's notion of an integrated transportation network is that much of the mass transit in the five boroughs is funded not by the MTA but by New York City. City-funded transit includes MTA Bus, which,as Defendants point out, operates about 79 bus routes covering 927 miles with a recent annual ridership of 120.9 million; and Staten Island Railway, a single line with a recent annual ridership of 4.4 million. (Herzog Decl., Ex. 1 (The MTA Network); Herzog Decl. Ex. 4 (Johnson Tr.) at 108-11). Additionally, New York City agencies fund the Staten Island Ferry, which has an annual ridership of over 20 million. (Schnall Decl., Ex. B).

absent in MTA's. First, PANYNJ's mass transit system, known as PATH, and PANYNJ's motor vehicle facilities were similar in scope and size.  There was PATH, a small-scale rail network connecting six points in New York City with seven points in New Jersey, and a group of six tunnels and bridges connecting points in New York City and New Jersey. (Schnall Decl., Exs. AA, BB).  Here, the mass transit systems are extensive and run for hundreds and hundreds of miles. Second, the self-sustaining PANYNJ operated and funded the facilities with fares and tolls but no outside tax support or subsidy. (Schnall Decl., Ex. BB).  Here, the MTA receives over $5.7 billion in dedicated taxes and other state and local subsidies, even more than it receives in mass transit farebox revenue. (Schnall Decl., Ex. A at 12). Finally, because the motorists outnumber the PATH train users and the rail network is compact, a smaller portion of motorists' PANYNJ toll dollars is needed to cross-subsidize mass transit. (Schnall Decl., Ex. P at 12).  Here, motorists are outnumbered by mass transit customers by nine to one, and the scale of the mass transit operation means a yawning operating deficit which a toll surplus cannot come close to closing.

Moreover, there is no functional relationship here. TBTA bridges and tunnels have a limited purpose: they allow people to travel with their vehicles across certain bodies of water between the boroughs of New York City, from the edge of one borough to the edge of another. MTA's mass transportation systems, though, move only people, and not simply across those bodies of water and between the edges of the boroughs, but far throughout the 12-county District.

16

In sum, it is a stretch of imagination to characterize the small group of facilities of the MTA affiliate TBTA, which serve motor vehicles, together with the sprawling mass transit facilities cobbled together under MTA control, as an "integrated transportation system." The mere fact that they are jointly controlled, and that surplus funds from TBTA facilities are transferred to MTA subsidiaries, does not make the underlying operations an "integrated transportation system." As such, motorists here cannot be said to benefit from the presence of an integrated transportation system, and any additional deference that the MTA seeks for its heavy toll-fare imbalance that might have been accorded under the case law in this circuit and elsewhere governing other multi-modal transportation systems deemed to be "integrated" should not be accorded.

### b. The tolls are excessive because certain MTA funds go to projects and initiatives that confer no qualifying benefit on TBTA facilities users.

Moreover, even if MTA's facilities could somehow be deemed as an integrated transportation system, user fees may be considered excessive when any funding goes to certain projects and initiatives that confer no direct benefit to that class of users. Each of the many projects and initiatives undertaken by the government actor should be examined to determine whether they are too far afield in scope or geography to specifically benefit the travelers paying the user fee. *See Bridgeport,* 567 F.3d at 84. In *Bridgeport*, the finder of fact was confronted with the question of whether a small ferry passenger fee surcharge that the Bridgeport Port Authority ("BPA") imposed on fares – between 50 cents and one dollar – was excessive. *Id.,* at

82-83. The lower court had undertaken a detailed approach in applying this prong of the *Northwest Airlines* test, as the Second Circuit noted with approval: "To determine whether the revenue from the Passenger Fee was unreasonably high compared to the benefits that the BPA provided to the ferry passengers, the District Court examined separately each activity of the BPA." *Id.*, at 84. The Second Circuit also affirmed the district court's understanding of "benefit" in this context to mean not a broad benefit but a benefit in a narrow, particular sense, and thus found that the fee was excessive because several BPA activities funded by the fee did not in fact confer a benefit on them *as* ferry travelers. Thus, in order to justify the level of MTA tolls – which are far higher than the BPA surcharges – funds may only be spent on initiatives that *specifically* and *directly* benefit motorists who use the bridges and tunnels.

As an initial matter, MTA's subsidization of the Student Metrocard program is not a project that specifically benefits motorists using TBTA facilities.[2] Under state law, pupil transportation is an education expense that is borne by the school district. *See* N.Y. Ed. L. Sec. 3635. New York City is no exception; it now spends about $1 billion transporting students on school buses. (Schnall Decl., Ex. CC at 35). The MTA, though, provides students who reside in New York City free and half-price Metrocards and obtains only partial reimbursement of foregone revenues from New York City and New York State. [cite] But by foregoing revenues here, the MTA

---

[2] Every MTA-funded initiative and program is suitable for examination, regardless of whether TBTA surpluses directly paid for them. Because tolls are set and increased for the purpose of reaching  targets and a balanced budget, revenues are essentially fungible. (Herzog Decl. Ex. 4, (Johnson Tr.) at 102:21 – 104:19.)

has been absorbing, and continues to absorb, an educational expense of New York City that is outside the MTA's ambit of responsibilities as a public transportation agency. In March of 2010, the MTA's chief executive made public statements in recognition of the very point that pupil transportation is not the responsibility of the MTA. (Schnall Decl., Ex. DD).

Thus, in the context of *Northwest Airlines* and *Bridgeport* "benefit" analysis, the MTA's Student Metrocard program may be a benefit to New York City government or to New York City residents with school-age children, but it cannot be said that it confers a specific benefit on motorists who use TBTA facilities.[3] Although MTA might characterize this program as beneficial to TBTA users because it reduces general automobile traffic within the City so they can more easily access TBTA facilities, such indirect aid falls outside the scope of "benefits" as contemplated by *Northwest Airlines* and as delineated in *Bridgeport*, which remains controlling legal authority in this Circuit. See *Bridgeport*, 567 F.3d at 87 (rejecting BPA's funding of improvements to the Interstate-95 highway near the ferry, *inter alia*, as a specific benefit to ferry passengers).

---

[3] The same holds true for the MTA's contention that the toll structure satisfies this prong because the TBTA facilities are part of an "integrated transportation system" that encompasses New York City Transit, LIRR, and MNR. The MTA's expert opines that the system confers upon toll-paying motorists the benefits of robust public transportation and the resulting congestion-free roadways. (Herzog Decl., Ex. 6 (Small Report) at 20. But the MTA's expert ultimately proves too much. Under *Bridgeport*, congestion-free roadways do not specifically benefit TBTA facilities users, but rather all motorists in the New York City area. *See Bridgeport*, 567 F.3d at 87.

The same holds true for the MTA's funding of the Arts for Transit program. As the MTA would have it, anything that makes mass transit travel more aesthetically pleasing encourages public transportation. But again, the works of art in the stations do not confer a specific benefit on motorists using of TBTA facilities.

Similarly, MTA's subsidization of local bus service in Nassau County did not confer a benefit on TBTA facilities users. In fact, MTA has all but acknowledged the error of its ways by discontinuing its ill-advised funding. Funding local bus service in any of the counties outside New York City is not now, nor has ever been, part of the responsibilities of the MTA.

Notably, MTA incorrectly cites an excerpt from a recent Second Circuit case to suggest a restatement of this Circuit's application of the *Evansville /Northwest Airlines* test. Contrary to MTA's suggestion, the recent decision in *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 260 (2d Cir. 2013) did not actually state that courts should look to whether the proceeds are directed to uses "which either enable or expedite passenger's travels." It merely agreed with the lower court's decision that a $.28 and a $1.00 toll charge was not excessive for the benefit it conferred *there*: "access to a well maintained trooper-patrolled highway" that enabled or expedited passenger's travels. The standard that the *Bridgeport* court set remains undisturbed: the court should look to whether a *specific* benefit has been conferred on the user of that *particular* facility. When a general benefit – for example, the reduction of traffic in the metropolitan area as cited by MTA's expert – has been

broadly conferred on not just the users of the facility but also on non-users, it is inappropriate to be included in the second-prong analysis. It is only equitable and sensible, after all, that TBTA facility users not be made to pay for the benefit of reduced traffic when it is all drivers that reap the benefit of reduced traffic.

That the MTA tolls are excessive in relation to the benefits conferred is further borne out by examining the toll rates on comparable toll bridges. Other bridges wholly located within the District are funded and operated by other transportation authorities include the New York Thruway Authority's long-span Tappan Zee Bridge and the small-span bridges of the New York Bridge Authority. Their toll rates are significantly lower than the toll rates on the TBTA facilities with comparable spans.  (Schnall Decl. Exs. G, EE, FF.)

### c.  The variable toll pricing discriminates against interstate commerce

MTA's toll pricing scheme at TBTA facilities offers one rate for motorists who pay the toll electronically with a New York E-ZPass Service Center-issued transponder  ("New York E-ZPass"), and a higher rate for motorists who use a transponder issued by out-of-state entities. For instance, Kelen was charged $4.00 when crossing the Henry Hudson Bridge in 2011 and 2012 using his Fast Lane transponder and account, which was issued and managed by a Massachusetts-based entity, while those using a New York E-ZPass at that time were charged only $2.20. (Schnall Decl. Exs. GG, HH.) The pricing scheme openly favors transponders and

prepaid transportation accounts from an in-state source and disfavors out-of-state transponders and prepaid transportation accounts from an out-of-state source.

Again, "[i]t has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." *New Energy*, 486 U.S. at 273 (citations omitted). Further, "[w]e have interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State.") *C&A Carbone v. Clarkstown*, 511 U.S. 383, 390 (1994). Thus, when a state actor accords different treatment to a transaction based on the origin of the device or the location of the transaction, as it does here, that constitutes *per se* discrimination under this negative aspect of the Commerce Clause, commonly known as the Dormant Commerce Clause.

Notably, when MTA first allowed for electronic toll payments on TBTA facilities, it charged the same toll rate whether the vehicle used a New York E-ZPass or an interoperable out-of-state transponder. Only in recent years did MTA begin to charge vehicles with out-of-state transponders a higher toll. When questioned about this differential treatment, deponent Dore Abrams testified that when other transportation agencies in the E-ZPass consortium began charging vehicles with a New York E-ZPass higher toll rates at their facilities than it charged vehicles with a home-issued transponder, the MTA retaliated and adopted the same policy. (Schnall Decl., Ex. II (Abrams Tr.), 48:1-49:16).

22

As the Supreme Court has held, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" are violative of the Commerce Clause. *New Energy*, 486 U.S. at 273. "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *Carbone*, 511 U.S. at 390. Although MTA might characterize its pricing as an incidental burden on interstate commerce, its purposeful retaliatory discrimination here is precisely what the Founders hoped that the Commerce Clause would outlaw. *Cf. Doran v. Massachusetts Turnpike Authority*, 348 F.3d 315 (1st Cir. 2003)(appellate court reviewing non-retaliatory differential electronic toll pricing in Massachusetts and finding no Commerce Clause violation against out-of-state motorists, without discussing the discrimination against out-of-state providers of transponders and prepaid transportation account services.)

**IV.  Conclusion**

The MTA bridge and tunnel tolls at issue here are unconstitutional unless they satisfy all three prongs of the *Evansville-Northwest Airlines* test. As detailed above, the record indicates that the MTA's user fees failed to meet each and every one of them. The fees impermissibly interfere with the flow of interstate traffic by unduly burdening the use of key road facilities. As such, Plaintiffs respectfully

request the Court to grant their Motion for Summary Judgment, and to deny

Defendants' Motion for Summary Judgment be denied.

Dated:        February 19, 2014


                                        /s/ Harley J. Schnall
                                        Harley J. Schnall

## Certificate of Service

I, Brian L. Bromberg, an attorney, hereby certify that on February 19, 2014, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service upon the following parties and participants:

Harley Jay Schnall schnall_law@hotmail.com

Leslie Gordon Fagen lfagen@paulweiss.com

Walter Rieman wrieman@paulweiss.com

Joshua David Kaye jkaye@paulweiss.com

Steven Craig Herzog sherzog@paulweiss.com

Melissa Courtney Monteleone mmonteleone@paulweiss.com


Dated:          February 19, 2014
                New York, New York


                                    /s/ Brian L. Bromberg
                                    Brian L. Bromberg