UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGUS PARTNERS LLC d/b/a Angus Energy and WHITE CRANE MARTIAL ARTS, INC., individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>            -against-<br><br>JAY WALDER, individually and in his official capacity, JAMES FERRARA, individually and in his official capacity, METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY d/b/a METROPOLITAN TRANSPORTATION AUTHORITY BRIDGES & TUNNELS,<br><br>                              Defendants. | |

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:                               │
│ DATE FILED:  9/16/14                 │
└─────────────────────────────────────┘
```

11 Civ. 0039 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

Plaintiffs, Angus Partners LLC d/b/a Angus Energy ("Angus Energy") and White Crane

Martial Arts, Inc. ("White Crane") bring this action under 42 U.S.C. § 1983 against Defendants,

the Metropolitan Transportation Authority (the "MTA"), the Triborough Bridge and Tunnel

Authority (the "TBTA"), Jay Walder, the Chairman and CEO of the MTA, and James Ferrara,

the Acting President of the TBTA, alleging that their bridge and tunnel tolls violate the

constitutionally-protected right to travel and the dormant Commerce Clause.[1]  Plaintiffs also

assert common law claims under New York law for unjust enrichment and for money had and

received.  Defendants move and Plaintiffs cross-move for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure.  For the following reasons, Defendants' motion is

GRANTED, and Plaintiffs' cross-motion is DENIED.

---

[1] Although the case caption states that Plaintiffs bring this action "individually and on behalf of others similarly situated," the representative plaintiffs have decided not to file a motion for class certification and pursue their claims only on their own behalf.   Joint Status Letter at 2, ECF No. 44.

# BACKGROUND

I.    Overview of the MTA and the MTA Transportation Network

The MTA operates "North America's largest transportation network" and provides transportation services across New York City (the "City") and the greater metropolitan area. Herzog Decl. Ex. 1 (The MTA Network), ECF No. 50-1. The MTA is a public-benefit corporation and was chartered by the New York State Legislature in 1965. *Id.* In 1968, the MTA was given additional authorization to develop and implement transportation policy for the greater New York metropolitan area, and the TBTA and the New York City Transit Authority (the "NYCTA") were placed under the common control of the MTA board of directors (the "MTA Board"). Herzog Decl. Ex. 9 (Report to Boards of MTA and TBTA) at MTATBTA-A 2894, ECF No. 50-9; *see also* N.Y. Pub. Auth. Law §§ 552, 1264. As provided in the authorizing statute,

> [t]he purposes of the [MTA] shall be the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district. . . . It shall be the further purpose of the [MTA], consistent with its status as the ex officio board of both the [NYCTA] and the [TBTA], *to develop and implement a unified mass transportation policy for such district.*

N.Y. Pub. Auth. Law § 1264 (emphasis added). The MTA has the power, among other things, to set tolls and fares, modify programs and operations, and issue debt to balance its budget and execute capital plans. *See id.* at §§ 1265, 1266; Schnall Decl. Ex. M (MTA Board Approves 2009 Budget), ECF No. 77-13.

The MTA transportation network includes the following subsidiaries and affiliates: (1) the MTA Bus Company ("MTA Bus"), a subsidiary of the MTA, which was created in 2004 and provides bus service in areas formerly served by seven private bus companies; (2) the Long

2

Island Railroad (the "LIRR"), a subsidiary of the MTA and a commuter railroad with eleven rail lines; (3) the Metro-North Railroad (the "MNR"), a subsidiary of the MTA and a commuter railroad with three major lines serving New York City's northern suburbs; (4) the MTA Capital Construction Company (the "MTACC"), a subsidiary of the MTA, which manages "mega-projects, including major system expansions and Lower Manhattan transit projects"; (5) the NYCTA, an affiliate of the MTA, which operates the New York City subways, the Staten Island Rapid Transit Operating Authority (the "SIRTOA"), and more than 200 bus routes not operated by MTA Bus;[2] and (6) the TBTA, an affiliate of the MTA, which owns and oversees the operation of nine toll bridges and tunnels within the City. Herzog Decl. Ex. 1 (The MTA Network); Herzog Decl. Ex. 2 (Expert Report of Mitchell L. Moss, Ph.D. (the "Moss Report")) at 6, 31, ECF No. 50-2. In addition, prior to 2012, the Long Island Bus Company (the "LIB"), which provides bus service primarily within Nassau County, was operated by the MTA pursuant to an agreement with Nassau County. Herzog Decl. Ex. 3 (Deposition Transcript of Hilary Ring ("Ring Tr.")) at 44, ECF No. 50-3. The MTA also operates the "Arts for Transit" program, which displays artwork throughout the MTA network, and the NYCTA operates a "Student MetroCard" program, which provides free and discount bus and subway fares to students. *See id.* at 8; Herzog Decl. Ex. 4 (Deposition Transcript of Douglas Johnson ("Johnson Tr.")) at 23–25, 69–70, 104–06, ECF No. 50-4. Together, the transportation services provided by the MTA transportation network extend across a portion of twelve counties in southeastern New York and two counties in southern Connecticut. Def. Resp. Pl. 56.1 ¶ 1, ECF No. 83.

In 2012, the total ridership on MTA public transportation was 2.6 billion, and more than more than 282 million vehicles used TBTA bridges and tunnels. Herzog Decl. Ex. 1 (The MTA

---

[2] More precisely, the NYCTA operates bus lines with its subsidiary, the Manhattan and Bronx Surface Transit Operating Authority.

3

Network).  The 2012 total operating budget of the MTA was approximately $12.6 billion,

Herzog Decl. Ex. 20, ECF No. 50-20, and the total operating budget for 2013 was $13.2 billion.

Herzog Decl. Ex. 1 (The MTA Network).  In 2012, MTA Bus had an annual ridership of

approximately 120.9 million with an average weekday ridership of 390,685, and its 2013

operating budget was $661.8 million.  *Id.*  In 2012, the LIRR had an annual ridership of

approximately 81.8 million with an average weekday ridership of 285,082, and its 2013

operating budget was $1.7 billion.  *Id.*  In 2012, the MNR had an annual ridership of

approximately 83 million and average weekday ridership of 281,331, and its 2013 operating

budget was $1.4 billion.  *Id.*  The 2013 operating budget of the MTACC was $35.2 million.

Moss Report 32.  In 2012, NYCTA subway and buses had an annual ridership of 2.3 billion with

an average weekday ridership of 7,579,555, and the 2013 operating budget of NYCTA's

subways and buses was $9.9 billion.  Herzog Decl. Ex. 1 (The MTA Network).  The SIRTOA,

which is also operated by the NYCTA, has an annual ridership of 4.4 million with an average

weekday ridership of 15,993, and its 2013 operating budget was $53.7.  *Id.*  In 2012, TBTA saw

more than 282 million vehicle crossings over its bridges and tunnels with average weekday

crossings of 798,117, and its 2013 operating budget was $586.5 million.  *Id.*  "[Four] of every

[five] rush-hour commuters to New York's central business districts (CBDs)[3] take mass transit."

Moss Report 5.

 In addition to the MTA, a number of other state and local public entities provide

transportation services and maintain bridges, roads, and tunnels in the greater New York

metropolitan area.  *See* Schnall Decl. Exs. C–K, ECF Nos. 77-3–77-11.  The New York City

Department of Transportation, for example, operates the Staten Island Ferry and a number of

---

[3] New York's CBD is defined as Manhattan south of 60th Street.  Herzog Decl. Ex. 9 (Report to Boards of MTA and TBTA) at MTATBTA-A 2887.

bridges and tunnels connecting Manhattan with the surrounding boroughs. *See* Schnall Decl.

Exs. B, D, ECF Nos. 2, 4.   There are other public authorities, such as the New York State

Thruway Authority and the New York Bridge Authority, which operate bridges and tunnels in

the City. *See* Schnall Decl. Exs. G, H, ECF Nos. 77-7, 77-8. Across the larger New York

metropolitan area, the majority of bridges and highways, both tolled and non-tolled, are operated

by public entities with no affiliation or subsidiary relationship to the MTA or TBTA. *See*

Schnall Decl.  Schnall Decl. Exs. D, I–K, ECF Nos. 77-4, 77-9–77-11.

II.    The TBTA

      A.  History and Legislative Overview of the TBTA

The TBTA, also referred to as MTA Bridges & Tunnels, was created by New York State

in 1933 as a public-benefit corporation to construct the Triborough Bridge.  Moss Report 25;

Herzog Decl. Ex. 1 (The MTA Network).   Originally chaired by Robert Moses, the TBTA was

authorized to collect tolls, which allowed it to be self-supporting and to finance the bridge's

construction.  Moss Report 25.  Under Moses' control, the TBTA had considerable autonomy to

finance additional capital projects and to construct bridges, tunnels, roads, and other

infrastructure in the City.  *Id.* at 25–26.  Moses, who created several other authorities (including

the Henry Hudson Parkway Authority, the Marine Parkway Authority, and the New York City

Parkway Authority) and oversaw numerous construction projects, consolidated these authorities

into the TBTA in 1940.  *Id.*  In 1946, the TBTA merged with the New York City Tunnel

Authority.  *Id.* at 25.  Following this merger, all of New York's bridge and tunnel authorities

were consolidated into a single entity under Moses' control.  *Id.*

In 1968, the New York State Legislature passed legislation converting the TBTA into an

MTA affiliate and placing the TBTA under the common control of the MTA Board, "effectively

ending Robert Moses' reign." *Id*. at 26; *see also* N.Y. Pub. Auth. Law § 1264.  This legislation granted the MTA the authority to use the TBTA's surplus revenues in furtherance of the MTA's mission to "develop and implement a unified mass transportation policy for [the metropolitan commuter transportation district]." *Id*.; *see also* Moss Report 26.  Subsequent legislation required the transfer of "twenty-four million dollars plus fifty percentum of the balance of [the TBTA's] operating surplus to the [NYCTA]" and specified that "the remainder shall be allocable to [the MTA] on behalf of the commuter railroads operated by it, by its subsidiary corporations or by others under joint arrangements."  N.Y. Pub. Auth. Law § 1219-a(2)(B); *see also* Moss Report 26.  The New York State Legislature has since given the MTA additional authority to use TBTA surplus revenues to pay debts on behalf of the MTA and the NYCTA, to fund capital projects, and to address critical transportation needs.  *Id*.; *see also* N.Y. Pub. Auth. Law §§ 552(2), 553(9), (12), (17), 569-c, 1219-a, 1269, 1270-d.  This has enabled the MTA to issue bonds backed by TBTA revenues (including future toll revenues), which "continues to be essential for regional mobility by supporting transit, bridges, and tunnels."  Moss Report 26.  The MTA Board is required by law to balance the MTA's budget and to close its budget deficit.  *See* Schnall Decl. Ex. M (MTA Board Approves 2009 Budget).  The MTA Board continues to set TBTA and NYCTA tolls and fares, modify operations throughout the MTA network, and issue debt in furtherance of that objective.  *See id*.; N.Y. Pub. Auth. Law §§ 1265, 1266.

      B.  TBTA Facilities and Tolls

The nine toll bridges and tunnels currently operated by the TBTA are the Robert F. Kennedy Bridge (formerly, the Triborough Bridge), the Throgs Neck Bridge, the Verrazano-Narrows Bridge, the Bronx-Whitestone Bridge, the Henry Hudson Bridge, the Marine Parkway-Gil Hodges Memorial Bridge, the Cross Bay Veterans Memorial Bridge, the Queens Midtown

Tunnel, and the Hugh L. Carey Tunnel (formerly, the Brooklyn Battery Tunnel).  N.Y. Pub.

Auth. Law §§ 553; Herzog Decl. Ex. 1 (The MTA Network).  In 2012, 282.8 million vehicles

travelled across the bridges and tunnels owned and overseen by the TBTA.  The TBTA has 1,545

employees.  *Id.*

  As of March 3, 2013, the tolls charged by the TBTA are as follows:  the toll to cross the

Marine Parkway-Gil Hodges Memorial and Cross Bay Veterans Memorial Bridges is $3.75; the

toll to cross the Henry Hudson Bridge is $5.00; and the toll to cross each of the remaining

bridges and tunnels is $7.50.  Moss Report 30–31.  The $15.00 round-trip toll on the Verrazano-

Narrows Bridge is only collected one-way, as required under federal law.  *See* Herzog Decl. Ex.

5 (Crossing Charges), ECF No. 50-5.  The TBTA also accepts tokens as payment for access to

certain bridges, and these tokens are sold in prepaid books or rolls.  *Id.*  Drivers paying with

tokens pay $2.50 rather than $3.75 to cross the Cross Bay and Marine Parkway Bridges.  *Id.*

  Drivers who are customers of the New York E-ZPass Customer Service Center ("NYCSC

E-ZPass") are eligible for lower toll rates than non-customers.  *See id*; Moss Report 30 n.108.

NYCSC E-ZPass customers are charged a $2.00 toll to cross the Marine Parkway-Gil Hodges

Memorial and Cross Bay Veterans Memorial Bridges; $2.44 to cross the Henry Hudson Bridge;

and $5.33 each way to cross each of the remaining TBTA bridges and tunnels.  Herzog Decl. Ex.

5 (Crossing Charges); *see also* Moss Report 30–31.  The $10.66 NYCSC E-ZPass round-trip toll

on the Verrazano-Narrows Bridge is only collected one-way.  *See* Herzog Decl. Ex. 5 (Crossing

Charges).  "Anyone, regardless of residency, can apply for a New York Customer Service

Center-issued E-ZPass tag."  *Id.*

  The TBTA is a member agency in the E-ZPass Interagency Group, which provides toll

collection systems in fourteen states.  *See id*.  Prior to 2009, the MTA and TBTA offered

7

discounted rates to all vehicles using an E-ZPass transponder irrespective of whether the transponder was obtained through the NYCSC or from another agency in another state. Schnall Decl. Ex. II (Deposition Transcript of Dore Abrams ("Abrams Tr.")) at 47–48, ECF No. 73-35. In 2009, the MTA and TBTA implemented a toll increase which eliminated the discounts on all non-NYCSC E-ZPasses but kept in place discounts for customers who pay tolls using an NYCSC E-ZPass. *Id.* Dore Abrams, the director of the operating budget at the TBTA, testified that this change was implemented after the MTA became aware that "other agencies in other states that had their own customer service center weren't offering the lower toll to [NYCSC] tag holders." *Id.* at 48. Abrams testified that the decision was made at the "MTA level" and that "the people I work for felt that it was a legitimate way of increasing revenue and maintaining consistency with the other agencies." *Id.* at 49.

Residents of Staten Island are eligible to receive additional discounts on the Verrazano-Narrows Bridge, and residents of the Rockaways and Broad Channel are eligible to receive additional discounts and State-funded rebates on the Marine Parkway-Gil Hodges Memorial and Cross Bay Veterans Memorial Bridges. *See* Moss Report 31. On the Verrazano-Narrows Bridge, the discount toll for residents of Staten Island paying by token is $8.53, and the NYCSC E-ZPass rate is $6.00. Herzog Decl. Ex. 5 (Crossing Charges). On the Marine Parkway-Gil Hodges Memorial and Cross Bay Veterans Memorial Bridges, the discount toll for residents of Rockaway and Broad Channel paying by token is $1.79, and the NYCSC E-ZPass rate is $1.31. *Id.* The constitutionality of the differential residence-based tolls charged on these bridges was recently recognized by the Honorable Paul A. Engelmayer in *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320 (S.D.N.Y. Oct. 16, 2013).

III.    TBTA Budget and Revenue Transfers

In 2013, the TBTA had an operating budget of $586.5 million, and approximately $936.8 million in surplus TBTA revenues were transferred to support mass transit services. Herzog Decl. Ex. 1 (The MTA Network). Defendants submit TBTA's financial statements for the year 2011, which provide additional detail as to how the TBTA's surplus revenues are reallocated among the MTA and its affiliates. *See* Herzog Decl. Ex. 7 (Financial Statements as of & for the Years Ended December 31, 2011 and 2010) at 10–12, ECF No. 50-7. In 2011, the TBTA had operating expenses of $512 million and generated revenues of $1.516 billion, yielding an income of $1.004 billion. *Id.* at 12. Pursuant to the statutory framework described above, in 2011, the TBTA provided approximately $528 million of its operating surplus to support mass transit and commuter rail, with approximately $202 million going to NYCTA and $326 million to the MTA to support the LIRR and MNR. *Id.*; Herzog Decl. Ex. 8 (Feb. 6, 2012 Staff Summary) at V-1, ECF No. 50-8. In 2011, TBTA also provided $85,100 in investment income to the MTA, *id.*, and made debt payments of approximately $280 million on NYCTA's behalf and $132 million on MTA's behalf. *Id.* at V-10.

Because the portion of TBTA revenue allocated to the MTA is used for commuter railroads, not all of MTA's programs receive surplus funds transferred from the TBTA. MTA's operating deficits are funded through taxes, such as the mortgage recording taxes and payroll mobility taxes. *See* Johnson Tr. at 92–104; Herzog Decl. Ex. 14 (Funding Sources of MTA Headquarters Operating Deficit), ECF No. 50-14. The operating budgets of the MTA Arts for Transit program, the SIRTOA, MTA Bus, and the LIB are funded through the MTA or, in some cases, by the City, and, based on the testimony of MTA's budget director, Douglas Johnson, no money from the TBTA goes to fund these programs. *See* Johnson Tr. at 104–11, 136–37.

9

Defendants also submit evidence that the cost to NYCTA of the Student MetroCard program is primarily foregone revenue, rather than out-of-pocket expenditures, because "the vast majority of the expense toward the operation that is utilized by the students exists already." Johnson Tr. at 24–25, 69–70; *see also* Ring Tr. at 38–39. State and City subsidies offset some of the cost of the Student MetroCard program. Johnson Tr. at 25, 69–72.

IV.     The Relationship Between Public Transit and Usage of TBTA Facilities

Defendants submit two expert reports addressing, among other things, the relationship between public transit and the usage of bridges, tunnels, and roadways in the metropolitan area. Plaintiffs have not offered expert testimony or reports that would contest the conclusions presented by Defendants' experts, nor have they challenged the qualifications of Defendants' witnesses to testify as experts.

The report prepared by Mitchell L. Moss, Ph.D., a professor of Urban Policy and Planning at New York University, addresses the relationship between mass transit and the use of bridges and tunnels in the region. *See* Moss Report 2, 7. Professor Moss begins his report by providing historical background on the MTA and its various subsidiaries and affiliates and by describing the historical relationship between the City's mass transit and bridge and tunnel services. *See id.* at 7–34. Relevant portions of the report have been cited in the MTA and TBTA background sections above. *See supra* Sections I, II.A. Professor Moss notes throughout his report that New York's policymakers explicitly created the MTA to develop and implement a uniform mass transportation policy for the region. *See* Moss Report 5, 7, 26, 42.

The Moss Report also examines the relationship between the transportation services provided by the MTA and the regional economy and concludes that "a well-funded public transportation system provides benefits both to travelers who use public transportation and

10

drivers who are able to travel via bridges and tunnels and connected roadways that are not burdened by the millions of travelers each day who are not on those roads because of mass transit." *Id.* at 2–3. In support of this conclusion, Professor Moss cites, among other things, a 2012 MTA Report showing that a ten percent shift from transit to automobile would add 5,500 additional cars daily on bridges to Manhattan and that a similar shift in the "Brooklyn/Queens corridor" would result in "rush-hour congestion levels . . . in both directions all day and night." *Id.* at 43. The report also provides evidence that, historically, capital investments in the mass transit and commuter rail systems have benefited users of the TBTA bridges and tunnels by reducing congestion and providing more attractive transportation options to individuals who might otherwise choose to drive. *Id.* at 43–45.

Relevant to this analysis, Professor Moss also considers the impact that an environmental crisis may have on a transportation system and describes what Superstorm Sandy revealed about the complex relationship between various parts of New York's transportation network. *Id.* at 57–70. Professor Ross' report states that the interdependencies between New York's mass transit services and its bridges and tunnels "were never more evident" than during the days following Superstorm Sandy. *See* Moss Report at 64–65. Professor Moss writes that "without the subways and commuter railroads operating normally, major arteries leading to Manhattan were jammed and city streets were in gridlock." *Id.* Although public agencies were able to mitigate congestion by creating bus-only and high-occupancy vehicle lanes on several TBTA bridges, survey results nonetheless showed that commuting times by private car "nearly tripled." *Id.* at 67–68. Professor Moss explains that this occurred because "[t]hose who tried to travel by car encountered massive traffic jams because of increased traffic resulting from the many people who would normally travel on the subway or commuter rail systems instead travelling by car."

11

*Id.* at 69.  Professor Moss further explains that "[t]he difficulties encountered by automobile travelers demonstrate how the automobile, commuter rail, and mass transit systems are functionally interdependent, and how events in one part of the system impact the other parts of the system." *Id.*

Beyond the impact on traffic congestion and the relative use of specific facilities, the Moss Report also recounts how the TBTA tolls themselves motivate would-be motorists to elect other modes of transportation and thereby benefit the remaining toll-payers by reducing the number of automobiles at peak hours and by reducing auto emissions.  *Id.* at 43–44.  Professor Moss further notes that the region's unified transportation system enables New York's businesses to access more talented employees and more customers, permits industries to locate in close proximity, facilitates face-to-face meetings, overcomes geographic limitations, and increases productivity.  *Id.* at 45–47.  Professor Moss provides the following conclusion regarding the benefits provided to TBTA toll-payers receive from an integrated transportation system that includes not only bridges and tunnels, but also mass transit and commuter rail:

> The automobiles and trucks that pay the tolls to use TBTA facilities benefit by having decreased traffic congestion on the bridges and tunnels and by the increased accessibility for workers seeking to commute in and through the MTA region.  Simply put, mass transit and commuter rail systems allow workers to get to places of employment across the region without adding to the traffic on the roads, bridges and tunnels.  Without transit and commuter rail, the increased congestion would cause lost time, uncertainty of travel times, increased fuel costs, and stress, which could affect the quality of life of nearly every resident and business in the Downstate area.

*Id.* at 42 (citations and internal quotation marks omitted).

Defendants also submit a report from Kenneth A. Small, Ph.D., an economics professor at the University of California, Irvine.  Herzog Decl. Ex. 6 (Expert Report of Kenneth A. Small

(the "Small Report")) at 1, ECF No. 50-6. Professor Small's report was prepared as a response to the question of whether the tolls charged by the MTA and TBTA are commensurate with the economic benefits provided. *See id.* The report describes, among other things, how toll prices and the price of public transit affect the transportation decisions of individuals who have the option of commuting by car. *See id.* at 8–15. Specifically, Professor Small states that:

> Raising bridge or tunnel tolls causes a small but measurable decrease in use of those bridges and tunnels. Some of this reduction represents diversion to unpriced crossings, which shifts congestion from the priced to the unpriced crossing; while some represents diversion to public transportation, which reduces the overall use of bridges and tunnels, thereby reducing congestion.

*Id.* at 13. Professor Small observes that without New York's mass transit network, "the road facilities would be overwhelmed by demand far exceeding their capacities." *Id.* at 20. The Small Report also addresses the impact of an integrated transportation system on the economic vitality of the New York metropolitan area. *See id.* at 20–21. Professor Small writes that "users of the bridges are receiving the benefits of the regional agglomeration in the New York region, made possible by the integrated transportation system that the bridges and tunnels are part of." *Id.* Among the benefits of agglomeration he cites are "increased economic activity, including wage rates" and the "enormous cultural and other benefits available (and in some cases, only available) in the New York region." *Id.*

Defendants also submit a report prepared the MTA and the TBTA in connection with proposed toll changes in October 2010, which states that "[g]iven the interdependence of the highway and transit networks, a decline in transit service quality can be expected to result in increased use of the already over-burdened highway network, without any practical means to provide additional road capacity." Herzog Decl. Ex. 9 (Report to Boards of MTA and TBTA) at MTATBTA-A 2889. The same report documented how the 2005 New York City transit strike

resulted in other transportation providers having to make adjustments in services and noted the "interdependency between MTA transit and bridge & tunnel facilities." *Id.* at MTATBTA-A 2891–92. The report stated, "[i]n conclusion, the interdependency between MTA transit and bridge & tunnel facilities remains as vital as ever." *Id.* at MTATBTA-A 2893.

V.   This Action

Angus Energy is a Florida corporation that provides professional services to businesses in the home heating industry. Baratz Decl. ¶¶ 2, 3, ECF No. 67. Employees of Angus Energy, including its president, Phillip Baratz, travel regularly to New York for business meetings. *Id.* ¶ 4. While in the New York City area, employees of Angus Energy travel to and from the airports, business meetings, and places of accommodation primarily by "motor vehicles equipped with an electronic transponder." *Id.* ¶ 5. One or more of the transponders used by Angus Energy employees and paid for by Angus Energy was an E-ZPass that is linked with an NYCSC account. *Id.* ¶¶ 7–8. Others were "associated with PlatePlass [sic], a third party vendor that provides transponders for rental car fleets," and were also paid for by Angus Energy. *Id.* ¶¶ 9– 10. One New Jersey-based employee of Angus Energy "regularly used TBTA facilities while on Angus Energy business, paying with his own E-ZPass transponder and account issued by the E-ZPass New Jersey Customer Service Center." *Id.* ¶ 11. Those charges were also reimbursed by Angus Energy. *Id.* ¶ 12. Baratz testified that when using TBTA facilities he was aware of alternate routes but that he personally would elect a more "convenient" or "easy" tolled route over a free one when going to appointments. Herzog Decl. Ex. 21 (Deposition Transcript of Philip Baratz) at 50–52, 56–57, ECF No. 50-21.

White Crane is a New York corporation, Compl. ¶ 6, and all officers and employees of White Crane are based in New York. Herzog Decl., Ex. 22 (Deposition Transcript of Edgar

Kelen ("Kelen Tr.")) at 5, 11–12, ECF No. 50-22.  Edgar Kelen, President of White Crane, frequently uses TBTA crossings in traveling for work-related reasons "because these provide the most direct route to my destinations" and, on occasion, as a way to avoid traffic.  Kelen Decl. ¶ 6, ECF No. 71; *see also* Kelen Tr. at 20–29, 89–90.   White Crane bears Kelen's work-related commuting costs.  Kelen Decl. ¶ 7.  When crossing TBTA bridges and tunnels for work, Kelen occasionally uses a "Fast Lane" transponder, an E-ZPass transponder purchased in Massachusetts, rather than an NYCSC E-ZPass transponder.  *Id.* ¶ 8; *see also* Kelen Tr. 32, 83. Because Kelen paid TBTA tolls using a Fast Lane transponder, some of the TBTA tolls reimbursed by White Crane are not eligible for the discount available to customers of NYCSC E-ZPass.  Kelen Decl. ¶ 8; *see also* Herzog Decl. Ex. 5 (Crossing Charges).

## DISCUSSION

I.   <u>Legal Standard</u>

In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the non-moving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Summary judgment is appropriate when the record demonstrates that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The movant bears the initial burden of informing the court of the basis for its motion and must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate that the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c);

*Celotex*, 477 U.S. at 323. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*

"The same standard applies where, as here, the parties filed cross-motions for summary judgment." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.* (citations omitted). "[E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Heublein, Inc. v. U.S.*, 996 F.2d 1455, 1461 (2d Cir. 1993).

Here, there are no genuine disputes of material fact; the parties only disagree about the application of the law to the facts. Def. Mem. 13, ECF No. 49; Pl. Mem. 2, ECF No. 76.

II.     The Right to Travel and the Dormant Commerce Clause

Plaintiffs allege that Defendants' bridge and tunnel tolls violate two distinct provisions of the U.S. Constitution:  the right to travel and the dormant Commerce Clause.

"Courts have long recognized that the Constitution protects a right to travel within the United States, including for purely intrastate travel." *Selevan v. New York Thruway Auth.* (*"Selevan II"*), 711 F.3d 253, 257 (2d Cir. 2013) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999); *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008)). "Although the Supreme Court has not felt impelled to locate this right definitively in any particular constitutional provision, it is variously assigned to the Privileges and Immunities Clause of Article IV, to the Commerce Clause, and to the Privileges [or] Immunities Clause of the Fourteenth Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment." *Janes*, 977 F. Supp. 2d at 332

16

(citations and internal quotation marks omitted).

"A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Atty. Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (citations omitted). Although strict scrutiny will apply to denials of the fundamental right to travel, "minor restrictions on travel simply do not amount to the denial of a fundamental right." *Selevan v. New York Thruway Auth.*, ("*Selevan I*"), 584 F.3d 82, 100–01 (2d Cir. 2009); *see also Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 714 (1972) ("A permissible charge to help defray the cost of [a state-provided] facility is . . . not a burden in the constitutional sense.").[4] In such circumstances, a district court will apply the three-part standard set forth by the Supreme Court in *Evansville* and *Northwest Airlines*. *Selevan I*, 584 F.3d at 100 (citing *Northwest Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 369 (1994); *Evansville*, 405 U.S. at 716–17).

The Commerce Clause provides Congress with the power "[t]o regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (internal quotation marks, bracket alterations, and citations omitted). Under the Supreme Court's dormant Commerce Clause doctrine, "a statute that clearly discriminates against interstate commerce in favor of

---

[4] Plaintiffs do not contend that the MTA and TBTA policies at issue warrant the application of strict scrutiny. *See* Pl. Mem. 6; Pl. Reply Mem. 2, ECF No. 87. To the extent the MTA and TBTA tolls implicate a possible violation of the right to travel, the tolls do not penalize that right and represent only a "minor restriction on travel." *Selevan I*, 584 F.3d at 101; *see also Town of Southold v. Town of East Hampton*, 477 F.3d 38, 53–54 (2d Cir. 2007); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999). As discussed at greater length below, the record does not support the conclusion that Defendants' toll policies were motivated by a discriminatory or protectionist purpose. They are charges "designed only to make the user of state-provided facilities pay a reasonable fee." *Selevan II*, 711 F.3d at 258 (citation and internal quotation marks omitted). Accordingly, strict scrutiny does not apply.

intrastate commerce is virtually invalid *per se* and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004). However, "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669 (1981). Accordingly, courts will distinguish between policies that "clearly discriminate[] against interstate commerce in favor of intrastate commerce" and those that "regulate[] evenhandedly with only incidental effects on interstate commerce." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 53–54 (2d Cir. 2007) (citing *Freedom Holdings*, 357 F.3d at 217–18). The Second Circuit recently held that in addressing a dormant Commerce Clause challenge to toll rates, a district court should undertake the analysis set forth by the Supreme Court in *Evansville* and *Northwest Airlines*. *See Selevan I*, 584 F.3d at 96–98.

A levy or toll is permissible—and not a violation of either the right to travel or the dormant Commerce Clause—if it "(1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Northwest Airlines*, 510 U.S. at 369 (citing *Evansville*, 405 U.S. at 716–17).[5] The third prong, whether a toll discriminates against interstate commerce, is a "threshold inquiry" and if a policy survives this prong it will "have a comparatively easier time passing constitutional muster." *Selevan I*, 584 F.3d at 94. Accordingly, the Court will address each of the *Northwest Airlines* factors in turn, beginning with the threshold question of whether the tolls discriminate against interstate commerce.

---

[5] Where strict scrutiny is not warranted, the analysis for a right to travel and dormant Commerce Clause claim are identical. *See Janes*, 2013 WL 5630629, at *14 ("[W]ith strict scrutiny held inapplicable, the two inquiries collapse."); *see also Selevan I*, 584 F.3d at 98, 102.

A.  Discrimination Against Interstate Commerce

"[A] state regulation 'discriminates' against interstate commerce only if it 'impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State.'"  *Id.* at 95 (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)).  To establish that a regulation or fee is discriminatory, a plaintiff must "identify an[] in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors."  *Selevan I*, 584 F.3d at 95 (quoting *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005)). A plaintiff must also identify the out-of-state competitor that is harmed by the toll policy. *Selevan I*, 584 F.3d at 95.  The Court must direct its inquiry "to determining whether [the policy] is basically a protectionist measure, or whether it can fairly be viewed as a [policy] directed to legitimate local concerns, with effects upon interstate commerce that are only incidental."  *City of Phila. v. New Jersey*, 437 U.S. 617, 624 (1978); *see also Janes*, 2013 WL 5630629, at *17. Once a plaintiff establishes that the policy in question is discriminatory, "the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests."  *Town of Southold*, 477 F.3d at 47 (citing *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1281–82 (1995)).

Plaintiffs contend that Defendants' policies discriminate against interstate commerce because the MTA and TBTA offer lower toll rates to motorists who use a NYCSC E-ZPass than to motorists who use non-NYCSC transponders, such as those purchased in other states.[6]  Pl.

---

[6] Defendants contend that Plaintiffs waived this argument because it was raised for the first time in Plaintiffs' opposition to Defendants' motion for summary judgment.  Def. Reply 19, 20, ECF No. 81.  Defendants' contention

Mem. 21–22.  Plaintiffs argue that this pricing scheme "openly favors transponders and prepaid transportation accounts from an in-state source and disfavors out-of-state transponders and prepaid transportation accounts from an out-of-state source." *Id.*  In support of this position, White Crane submits evidence that its president paid higher toll rates when using a Fast Lane transponder purchased in Massachusetts than he would have paid using an NYCSC E-ZPass. *See* Kelen Decl. ¶¶ 7, 8; Schnall Decl. Exs. GG, HH.  Angus Energy also submits evidence that it has borne the commuting costs for employees who paid the non-discounted TBTA toll rates using a non-NYCSC E-ZPass.  *See* Baratz Decl. ¶¶ 10, 11.  Plaintiffs also contend that the MTA's purpose in adopting differential rates for non-NYCSC customers is one of "retaliatory discrimination."  *See* Pl. Mem. 23.  Plaintiffs cite the deposition testimony of Dore Abrams, who stated that prior to 2009 the MTA offered discounted rates to all vehicles using an E-ZPass transponder regardless of its state of origin, not just those purchased through the NYCSC.  *See* Abrams Tr. 9, 47–49.  Abrams testified that the differential E-ZPass rates were adopted in 2009 because "other agencies in other states that had their own customer service center weren't offering the lower toll to [NYCSC] tag holders."  *Id.* at 48.  Notwithstanding Abrams' testimony that "the people I work for felt that it was a legitimate way of increasing revenue and maintaining consistency with the other agencies," *id.* at 49, Plaintiffs ask the Court to conclude that the NYCSC E-ZPass toll discounts are an instance of "those jealousies and retaliatory measures the Constitution was designed to prevent."  *See* Pl. Mem. 23 (quoting *C & A Carbone*, 511 U.S. at 390).

---

is unavailing.  As an initial matter, the memorandum in which Plaintiffs articulated this theory of discrimination was not merely their opposition; it was also Plaintiffs' first memorandum in support of their motion for partial summary judgment.  *See* Pl. Mem. 1, 2.  Moreover, Defendants were on notice that Plaintiffs were alleging that Defendants' toll prices were discriminatory, Compl. ¶¶ 110, 115, and the complaint, initially filed as a class action complaint, also alleged differences between TBTA's base rates and the rates charged to NYCSC E-ZPass customers, *see id.* ¶¶ 95, 96, 113.  Unlike the cases cited by Defendants, the claim here was first asserted in the complaint.  The question of whether the discounts offered to NYCSC E-ZPass customers are discriminatory is properly before the Court.

*Doran v. Massachusetts Turnpike Auth.*, 348 F.3d 315, 319-20 (1st Cir. 2003) is instructive.  In *Doran*, the plaintiffs alleged that toll discounts the Massachusetts Turnpike Authority offered on certain toll plazas and tunnels in the Boston area to Fast Lane customers, but not to customers of comparable transponder systems offered in other states, discriminated against interstate commerce.  The plaintiffs in *Doran* argued that the policy was discriminatory because a heavier toll burden was imposed on out-of-state residents than on in-state residents. *See id.*  The First Circuit rejected this argument on three grounds.  First, the court concluded that the policy was not discriminatory because the Fast Lane transponders, and therefore the discounts, were available to in-state and out-of-state residents alike, noting that "[a]ny traveler can qualify for a discount but the decision whether to do so turns principally on anticipated frequency of travel." *Id.* at 321.  The court explained that in-state residents who fail to use a Fast Lane transponder would also pay the non-discounted rates, concluding "it is expected that nonparticipants will pay higher tolls but it does not follow that interstate commerce will be burdened, much less that it will suffer discrimination." *Id.*  Second, the court rejected the argument that the policy was discriminatory on its face, citing plaintiffs' failure to identify a competitor and holding that customers of other transponder systems cannot be said to have been "penalized" given that nothing in the policy prohibits drivers from carrying multiple transponders. *Id.* at 322.  Finally, the court declined to find a discriminatory or protectionist purpose and recognized that the stated purpose of benefitting frequent commuters was constitutionally valid. *Id.* at 321.

Plaintiffs contend that *Doran* is inapposite because they are not alleging that the MTA and TBTA's discount policy discriminates based on residency, but rather that the pricing scheme involves "discrimination by a state actor between *articles* of commerce according to the state of

21

origin," *i.e.*, the transponders and accounts that are linked to those transponders.  Pl. Reply Mem. 9 (emphasis in original); *see also* Pl. Mem. 22.  Plaintiffs ask the Court to review Defendants' policy under case law prohibiting states from discriminating against articles of commerce coming from outside the state and argue that Defendants' policy of charging higher rates when vehicles use an out-of-state transponder constitutes "*per se* discrimination."  Pl. Mem. 22–23 (citing *C & A Carbone*, 511 U.S. at 417); Pl. Reply Mem. 9.

Plaintiffs' attempt to distinguish *Doran* is unpersuasive.  In asking the Court to focus on the articles of commerce rather than the individuals or entities affected, Plaintiffs fail to satisfy their burden of identifying an in-state interest that is benefitted or an out-of-state competitor that is harmed.  *Selevan I*, 584 F.3d at 95; *Janes*, 977 F. Supp. 2d at 337–38.  The Court agrees with the First Circuit that the payment systems that operate at toll collection points in other states cannot be said to "compete" with the NYCSC E-ZPass payment system used by Defendants.  *See Doran*, 348 F.3d at 322.  The record here shows that the TBTA is a member of the multistate E-ZPass Interagency Group, which implements toll collections in fourteen states, *see* Herzog Decl. Ex. 1 (The MTA Network), and Plaintiffs submit no evidence of any competition or harm occurring to the other agencies in this network or to any other competitor.  *See Selevan I*, 584 F.3d at 95.  To the contrary, the record indicates that the discount policy was implemented, in part, to "maintain[] consistency with the other agencies."  Abrams Tr. 49.  "'Laws that draw distinctions between entities that are not competitors do not "discriminate" for purposes of the dormant Commerce Clause.'"  *Selevan I*, 584 F.3d at 95 (quoting *Town of Southold*, 477 F.3d at 49); *see also Freedom Holdings*, 357 F.3d at 217–18 ("For dormant Commerce Clause purposes, the relevant 'economic interests,' both in-state and out-of-state, are . . . not those of the state itself.") (citations omitted).

22

To the extent that Plaintiffs argue that individuals or businesses with NYCSC transponders and accounts benefit relative to those lacking such articles, Plaintiffs' position fails for the same reason articulated in *Doran*. Any person or business, regardless of residency, can obtain a NYCSC E-ZPass transponder and thereby receive discounted tolls on TBTA bridges and tunnels, and there is nothing in the record to suggest that motorists are prohibited from owning and using more than one transponder. *See* Herzog Decl. Ex. 5 (Crossing Charges). As in *Doran*, the evidence demonstrates that any burden associated with non-discounted tolls falls on in-state and out-of-state interests alike. Specifically, the record indicates that New York residents who pay in cash or via a non-NYCSC transponder pay precisely the same tolls as out-of-state motorists who pay in the same manner, whereas out-of-state motorists who pay the tolls via NYCSC E-ZPass receive the same discounts as New York residents. Indeed, evidence submitted by Plaintiffs essentially illustrates this point. Angus Energy, a Florida entity, paid discounted toll rates associated with an NYCSC E-ZPass, Baratz Decl. ¶¶ 3, 7–8, whereas White Crane, a New York entity, paid full-price tolls when its president, a New York resident, used a Massachusetts Fast Lane transponder. Kelen Decl. ¶¶ 2–8. Plaintiffs have failed to establish more than an incidental effect on interstate commerce.[7] *See also C & A Carbone*, 511 U.S. at 404 (O'Connor, J., concurring) ("[T]he fact that interests within the regulating jurisdiction are equally affected by the challenged enactment counsels against a finding of discrimination.").

Moreover, the MTA's decision to implement differential toll rates is not evidence of a retaliatory or protectionist purpose. Contrary to Plaintiffs' characterization, Abrams' testimony demonstrates that the MTA implemented its differential toll discount policy to maintain consistency with other agencies with similar policies. Abrams Tr. 48–49. Defendants also

---

[7] The incidental nature of any alleged harm to Plaintiffs is further evidenced by their testimony that Plaintiffs elected to pay the TBTA's allegedly unconstitutional tolls out of convenience, despite being aware of free alternate routes. *See* Baratz Tr. at 50–52, 56–57; Kelen Tr. 20–29, 89–90.

submit evidence showing that the pricing policies generally serve to address traffic and congestion on the bridges and tunnels and target discounts to motorists based on anticipated frequency of use. Small Report 8-15, 18. As other courts have recognized, these are legitimate local concerns consistent with the Commerce Clause and the right to travel. *See, e.g.*, *Town of Southold*, 477 F.3d at 48 (upholding town ferry law as nondiscriminatory based, in part, on district court's finding that "the law was not motivated by a discriminatory animus but by the need to address a growing traffic problem in the Town"); *Janes*, 2013 WL 5630629, at *17 (finding that "alleviat[ing] unique geographic burdens" through residency-based toll discounts was "a legitimat and non-discriminatory governmental purpose").

Lastly, Plaintiffs' framing of the issue—that the E-ZPass transponder payment systems are articles of commerce analogous to the waste treatment services at issue in *C & A Carbone*, 511 U.S. at 390–91, the trucking services in *Am. Trucking Ass'n, Inc. v. Whitman*, 437 F.3d 313 (3d Cir. 2006), or the direct shipments of out-of-state wine at issue in *Granholm v. Heald*, 544 U.S. 460 (2005)—is unpersuasive. The transponder system is, like the tokens accepted by the TBTA or the MetroCards accepted on MTA buses and subways, a method of payment rather than a good or service that is transacted in an interstate market. Under Plaintiffs' proposed logic, the MTA would presumably be required to accept transit cards purchased from the Washington D.C. Metro in charging for access to the New York City subways, and the MTA would presumably have to make available to such customers the same discounts that are offered to MetroCard customers, even though anyone, regardless of residency, can purchase a MetroCard and obtain discounts directly from the MTA. This view of discrimination is too sweeping. Absent a showing of some protectionist purpose or more than an incidental effect on interstate commerce, the Commerce Clause does not prohibit a state transportation authority from

addressing legitimate local concerns through its toll policy or from exercising reasonable discretion in determining which payment systems to accept in exchange for use of its facilities. *Doran*, 348 F.3d at 321–22; *see also City of Phila.*, 437 U.S. at 624; *McBurney v. Young*, 133 S. Ct. 1709, 1720 (2013).

Accordingly, because Defendants' toll policies do not discriminate against interstate commerce, Defendants have cleared the first hurdle under *Northwest Airlines*.

B.  Fair Approximation of Use and Excessiveness in Relation to the Benefits Conferred

Plaintiffs take issue with the MTA's policy of allocating TBTA toll revenue surpluses to fund other programs and facilities operated by the MTA and its subsidiaries and affiliates. *See* Pl. Mem. 9–21. Plaintiffs offer essentially two reasons that tolls charged on the TBTA operated bridges and tunnels do not reflect a "fair estimation of the use of those facilities," *id.* at 9–12. Plaintiffs argue that tolls paid by TBTA customers (1) are excessive in relation to the cost of maintaining the bridges and tunnels, as evidenced by approximately one billion dollars in surplus revenue collected annually by the TBTA, and (2) are being used to subsidize MTA facilities and programs unrelated to the operation or maintenance of the TBTA bridges and tunnels. *Id.* at 9–12. Plaintiffs raise similar concerns in claiming that the tolls collected are "excessive in relation to the benefits conferred." *Id.* at 12–21. Plaintiffs complain that surplus TBTA toll revenues are used to fund unrelated facilities and programs "cobbled together under MTA control," which provide "no qualifying benefit on TBTA facilities users." *Id.* at 17–21. Plaintiffs propose that the Court, rather than taking into consideration the costs and benefits of an "integrated transportation system," must limit its focus to the costs and benefits of the TBTA bridges and tunnels, which serve the limited purpose of "allow[ing] people to travel with their vehicles across certain bodies of water." *Id.* at 10–17.

1.  Integrated Transportation System

Before reaching the fair approximation and excessiveness prongs under *Northwest Airlines*, the Court must first determine which MTA and TBTA facilities are properly within the scope of its analysis.  "[I]f a bridge toll generates more revenue than necessary to provide a fair profit or rate of return, the toll may not be challenged successfully if it is used to support a single integrated transportation system in which the successful operation of the bridge is dependent in whole or part on the operation of the other related facilities."  *See Molinari v. New York Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 725 (E.D.N.Y. 1993).  Thus, a threshold issue for resolving the remaining *Northwest Airlines* prongs is whether the MTA's network of transportation services constitutes an "integrated transportation system" from which TBTA toll-payers can be said to benefit and to which TBTA surpluses may be allocated.

Plaintiffs maintain that the MTA and its subsidiaries and affiliates cannot be said to operate an integrated transportation system, Pl. Mem. 12–17, and argue, in the alternative, that none of the non-TBTA facilities or programs operated by or affiliated with the MTA should be credited with conferring a benefit to TBTA toll-payers.  *See id.* at 17–21.  In support of their position, Plaintiffs cite extensive figures and data regarding the costs, routes, and ridership of the NYCTA, LIRR, and MNR, as well as several other MTA programs, including Arts for Transit, the Student MetroCard program, MTA Bus, and the LIB.  *See* Schnall Decl. Exs. E, Q–X, ECF Nos. 77-5, 77-17–77-24.  Plaintiffs contend that these MTA facilities and programs, a "hodge-podge of roads and rails," are too far removed from the services provided by the TBTA bridges and tunnels to be considered part of a single system.  *See* Pl. Mem. 12–17.  Plaintiffs also proffer evidence that there are thousands of miles of roadways, bridges, and tunnels that are not operated

by the MTA or TBTA in support of their position that no integrated transportation system exists. Pl. Mem. 12–13; *see also* Schnall Decl. Exs. C–K.

Defendants reject Plaintiffs' characterization of the MTA network as an assemblage of unrelated programs and facilities and urge the Court to conclude that the MTA and TBTA operate a functionally integrated transportation system. Def. Mem. 17–26; *see also Janes*, 2013 WL 5630629, at *19–20. Defendants direct the Court to the 1968 legislation that brought the TBTA and NYCTA under the control of the MTA, in which the New York State Legislature stated that the purpose of the MTA is to "develop and implement a unified mass transportation policy." N.Y. Pub. Auth. Law § 1264. Defendants also submit two uncontested expert reports which provide extensive support for the proposition that the MTA does, in fact, operate a unified and integrated transit system, and that this system provides substantial benefits to users of the TBTA facilities in proportion to their use. Specifically, Defendants submit evidence that the availability of mass transit and commuter railways impacts demand and generally mitigates the level of traffic congestion at TBTA-operated bridges and tunnels. Moss Report 42–45; Small Report at 8–15. Defendants also provide a report detailing how crises such as Superstorm Sandy reveal the functional interdependencies between bridge and tunnel use and mass transportation. Moss Report 57–70. The benefits of reduced traffic congestion, which include lower fuel costs, reduced stress, and more predictable wait times, are conferred to motorists each time they patronize the TBTA's facilities and avoid traffic that would occur in the absence of functioning mass transit and commuter rail systems. *See id*. at 42–43. Moreover, as Defendants' expert reports further demonstrate, motorists (whether employers, employees, businesses, or consumers) who use the TBTA's facilities also receive economic benefits from being able to access the efficiencies and scale of New York City, which are made possible, in part, by the

integrated transportation system provided by the MTA and its various subsidiaries and affiliates. *See* Moss Report 45–47; Small Report 20–21.   The economic benefits of this "agglomeration" identified by Professor Small include "increased economic activity, including wage rates" and the "enormous cultural and other benefits available (and in some cases, only available) in the New York region." *Id*. at 20–21.   Professor Moss also identifies economic benefits made possible by the MTA's transportation network, including an increased flow of people and goods, expanded access to jobs and workers, increased office capacity, greater proximity of businesses, and other improvements in productivity stemming from face-to-face interactions.   *See* Moss Report 45–47.   Professor Moss concludes that "the services provided by the MTA and its affiliates and subsidiaries facilitate the movement of people and goods through and between other parts of the metropolitan area, making possible a density of people and economic activity throughout the region greater than (and more economically productive than) any other U.S. city or metropolitan area." *Id*. at 46.

Although Plaintiffs have shown that the MTA and its subsidiaries and affiliates operate a number of transportation services across a geographic region spanning the greater New York City metropolitan area, they have failed to adduce any evidence on the specific question of whether Defendants' transportation facilities are discrete services or whether the services function together to constitute an integrated transportation system.   Nor does the fact that other entities also provide access to the City (*e.g.*, the bridges and tunnels operated by the NYC Department of Transportation, the New York State Thruway Authority, and the New York Bridge Authority) support an inference that the MTA and TBTA do not operate an integrated system.   Plaintiffs have not identified a single case in which a court required all means of transportation in a region to be exclusively operated by a single entity in order to establish the

existence of an integrated transportation system. Indeed, in *Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, 887 F.2d 417, 421 (2d Cir. 1989), the Second Circuit upheld a district court finding that the Port Authority, which operates PATH trains, buses, and several bridges and tunnels connecting New York and New Jersey, operates "an integrated interdependent transportation system," even though the Port Authority is not the exclusive provider of transportation services in the region or between New York and New Jersey. *See also Wallach v. Brezenoff*, 930 F.2d 1070, 1071 (3d Cir. 1991). And both *Janes*, 2013 WL 5630629, at *19–20, and *Molinari*, 838 F. Supp. at 726, recognized that the MTA operates an integrated transportation system, notwithstanding the fact that other means of transportation are available in the region. Defendants have established that the MTA and TBTA operate an integrated transportation system that confers substantial benefits on motorists who pay TBTA tolls.

2.   Whether Tolls Charged Are Based on a Fair Approximation of Use

Having determined that Defendants operate an integrated transportation system, the Court must still address whether the amounts of the TBTA's tolls fairly approximate the costs of use and are excessive compared to the benefits toll-payers receive. Under the first prong, states and localities are afforded some flexibility in setting rates "so long as the toll is based on some fair approximation of use or privilege for use." *Evansville*, 405 U.S. at 716. Toll rates will satisfy the fair approximation requirement "even though some other formula might reflect more exactly the relative use of the state facilities by individual users." *Evansville*, 405 U.S. at 717. Even if the tolls charged create a surplus, all that is required is a "functional relationship" between the toll and the facilities used by the toll's payers. *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009) ("A user fee . . . may reasonably support the budget of a governmental unit that operates facilities that bear at least a 'functional

relationship' to facilities used by the fee payers."). Revenue surpluses and corresponding toll rates are not assessed in isolation, but must be evaluated relative to the costs of the facilities and to the benefits conferred. *See Selevan II*, 711 F.3d at 259–60.

"[T]he *Northwest Airlines* test permits the state to make 'reasonable' exceptions to its fee schedule, so long as the fee schedule, on the whole, reflects at least 'a fair, [even] if imperfect, approximation of the use of facilities for whose benefit they are imposed.'" *Selevan I*, 584 F.3d at 97 (citing *Evansville*, 405 U.S. at 717). For example, in *Janes*, the court held that the MTA and TBTA policy of providing toll discounts to residents of Staten Island, the Rockaways, and Broad Channel on three TBTA bridges did not violate the plaintiffs' right to travel or the Commerce Clause. 2013 WL 5630629. The court noted that the usage patterns supported providing volume discounts to users who were "locked in" to certain facilities and would have heavy transit burdens and rejected the plaintiffs' arguments that nonresidents paid unduly more for the same access. *Id.* at 18. "The *Northwest Airlines* test is not inflexible; it simply requires 'reasonableness.'" *Selevan I*, 584 F.3d at 98.

In evaluating whether Defendants' toll rates reflect a "fair approximation," the Court may take into consideration costs associated with the facilities that functionally support the TBTA bridges and tunnels. *See Bridgeport*, 567 F.3d at 87 (citing *Auto. Club*, 887 F.2d at 421). Defendants have demonstrated that a "functional relationship" exists between the various facilities and programs operated by the MTA and the bridges and tunnels used by the payers of the TBTA's tolls. Traffic spillover and substitution effects are appropriate considerations in determining whether a functional relationship exists. *See Auto. Club*, 887 F.2d at 422; *see also Cohen v. Rhode Island Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439, 448–49 (D.R.I. 2011). Defendants' uncontested expert reports establish that the MTA operated transportation network

provides motorists with transportation options and serves to reduce congestion on bridges and tunnels throughout the City. Moss Report 42–45; Small Report at 8–15; Herzog Decl. Ex. 9 (Report to Boards of MTA and TBTA) at MTATBTA-A 2889–93. Indeed, usage of MTA mass transportation and commuter rail services influences TBTA facilities to such an extent that closures in parts of the system could result in "rush-hour congestion levels . . . in both directions all day and night" on certain TBTA facilities. Moss Report 43. Defendants also submit evidence that the Arts for Transit program, the Student MetroCard program, MTA Bus, and the LIB all, in varying degrees, functionally support the TBTA bridges and tunnels by encouraging greater use of public transportation and thereby reducing traffic. *See* Johnson Tr. 67; Moss Report 44–45. Thus, given the substantial evidence that traffic flow on the TBTA bridges and tunnels would suffer significantly without the MTA's mass transit and commuter railway services, it is not unfair for the MTA to allocate TBTA surpluses to support these functionally related facilities. *Cf. Auto. Club*, 887 F.2d at 423.

Plaintiffs observe that "[the] TBTA has annually collected over $1 billion in tolls from motorists in every year during the relevant period, [sic] and transferred approximately 60% of those funds – hundreds of millions of dollars – as surplus revenues." Pl. Reply Mem. 6.[8] Plaintiffs contend that "even under an integrated transportation system, the grossness of the margins, in percentage and absolute terms, cannot be considered even close to being a fair approximation when the 'discrepancy here exceeds permissible bounds.'" Pl. Reply Mem. 6 (citing *Bridgeport*, 567, F.3d at 84). Although the TBTA's operating budget was in the range of $586.5 million for 2013, the MTA's total operating budget for the same year was $13.2 billion,

---

[8] More concretely, the TBTA's toll revenues in 2011 were $1.516 billion on an operating budget of $512 million. Herzog Decl. Ex. 7 (Financial Statements as of & for the Years Ended December 31, 2011 and 2010) at 10–12. Of that amount, approximately $940 million in TBTA surpluses went to support MTA mass transit and commuter railway services. *See* Herzog Decl. Ex. 8 (Feb. 6, 2012 Staff Summary) at V 1–V 10. In 2013, the TBTA operating budget was $586.5 million and approximately $936.8 million in TBTA surpluses went to support mass transit and commuter railway services. Herzog Decl. Ex. 1 (The MTA Network).

and the operating budgets of the NYCTA, LIRR, and MNR were $9.9 billion, $1.7 billion, and $1.4 billion respectively. Herzog Decl. Ex. 1 (The MTA Network). The standard is one of "reasonableness," *Selevan I*, 584 F.3d at 96, 102, and the Court will not substitute its own judgment for that of the legislature or the managers of the City's transportation system. In light of the substantial operating and maintenance costs and the demonstrated functional interdependencies, it does not offend notions of reasonableness or fairness that TBTA surpluses in the range of $940 million are allocated to support related facilities within the same integrated transportation network. *See Molinari*, 838 F. Supp. at 725; *Auto. Club*, 887 F.2d at 421–22. Nor does the fact that tolls are assessed on a per-trip basis render the toll burden unfair. *See Doran*, 348 F.3d at 319-21; *Janes*, 2013 WL 5630629, at *18. Although a more exacting formula might correspond more accurately to the cost of operating the bridges and tunnels and the functionally related facilities, such precision is not required. *Selevan I*, 584 F.3d at 97–98 ("We emphasize that there need not be a perfect fit between the use of the [facilities] and the support of [facilities] by the toll.") (quoting *Bridgeport*, 567 F.3d at 86); *see also Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth.*, 906 F.2d 516, 520 (11th Cir. 1990).

Accordingly, the fair approximation prong of the *Northwest Airlines* test is met.

3.   Whether Tolls Charged Are Excessive Compared to the Benefits Toll-Payers Receive

Under the excessiveness prong, the tolls collected may not exceed proper margins when taking into consideration the benefits conferred. *Selevan II*, 711 F.3d at 260. Again, the standard "simply requires reasonableness." *Id*. *Janes* is instructive here. 977 F. Supp. 2d at 340–42. In evaluating the excessiveness requirement, the court found that the "[d]efendants' expert reports persuasively demonstrate[d] that the tolls charged for use of the TBTA bridges, used to strengthen the city's mass transit system, confer vast benefits enjoyed by all users of

New York City's integrated transportation system." *Id.* at 340–41. Those benefits included: "attracting industry; attracting and retaining a talented workforce; attaining economic productivity; and providing 'redundancy and resilience' for the region in the event of disasters and crises." *Id.* The court explained that motorists using the bridges benefited from the availability of other commuting options through a corresponding reduction in traffic and concluded that the defendants had sufficiently demonstrated that motorists paying TBTA tolls "benefit in fair relation to the fees or tolls they pay." *Id.* at 342. The court further noted that all commuters benefitted from the existence of a "smoothly functioning mass transit system" and explicitly rejected the argument that the benefits conferred "must redound lopsidedly to those who pay that fee or toll." *Id.* at 341–42 (citing *Molinari*, 838 F. Supp. at 726).

Plaintiffs contend that notwithstanding the existence of an integrated transit system the TBTA's tolls are excessive because they go to fund certain MTA facilities and programs, namely Arts for Transit, the Student MetroCard program, MTA Bus, and the LIB, which do not confer specific benefits to the payers of the TBTA tolls. *See* Pl. Mem. 17–21 (citing *Bridgeport*, 567 F.3d at 87). This argument suffers from two major deficiencies. First, Plaintiffs have failed to establish that the challenged programs even received TBTA surpluses. Defendants concede that the TBTA revenues are allocated, as required by statute, to NYCTA, LIRR, and MNR to provide support for mass transit and commuter railways, *see* Def. Mem. 17–18, but Defendants also submit testimony and documentation showing that no money from the TBTA went to support Arts for Transit, the Student MetroCard program, MTA Bus, or the LIB. Johnson Tr. at 104–11, 136–37; Herzog Decl. Ex. 8 (Feb. 6, 2012 Staff Summary) at V-1–V-10. Plaintiffs have failed to identify any evidence to the contrary. Money is, as Plaintiffs note, fungible, and the fact that TBTA revenues are used to fund NYCTA mass transit and LIRR and MNR commuter railway

33

expenses may in fact enable the MTA to use other money to support these programs and services. *See* Johnson Tr. at 102–04. However, in the absence of any evidence that TBTA toll surpluses were actually used to support Arts for Transit, the Student MetroCard program, MTA Bus, and the LIB, Defendants are under no obligation to ensure that each such program or service benefits TBTA toll-paying motorists in proportion to the tolls paid. Unlike in *Bridgeport*, 567 F.3d at 87, there is no evidence that tolls were actually going to support the contested activities.

Second, even if Plaintiffs could demonstrate that TBTA surpluses were used in the manner alleged, the TBTA's use of the tolls for these purposes would only be invalid if those challenged facilities and programs did not functionally support the integrated transportation system upon which the TBTA bridges and tunnels depend. Because Defendants have demonstrated the existence of a functionally integrated transportation system, Plaintiffs' particularized grievances as to Arts for Transit, the Student MetroCard program, MTA Bus, and the LIB would not need to be considered individually even if those programs received TBTA funds. This case is distinguishable from *Bridgeport*, 567 F.3d at 87, which did not involve a functionally integrated transportation system, but rather involved discrete government services found to bear no functional relationship to the ferry services paid for by ferry passengers. Indeed, the Second Circuit in *Bridgeport* acknowledged that the very reason the district court "had no choice but to make particularized inquiries as to the various [Bridgeport Port Authority] expenditures" was that the authority's budget was supporting activities that were of no benefit to ferry passengers. 567 F.3d at 87. That is not the case here.

The degree of precision demanded by Plaintiffs is not what the law requires. *See e.g.*, *Cohen*, 775 F. Supp. 2d at 449–50; *Janes*, 977 F. Supp. 2d at 342. As discussed above, the

34

uncontested benefits that MTA's functionally integrated transit system confers to TBTA toll-payers include reductions in traffic congestion on TBTA bridges and tunnels, along with associated reductions in fuel costs, stress, auto emissions, and wait times, as well as the benefits of agglomeration and improved access to the diverse economic markets and cultural attractions of New York City. *See also* Moss Report 42–47; Small Report 20–21.  Defendants have easily met their burden, given that the TBTA toll surpluses in question primarily support mass transit and commuter railroad services and Defendants' experts have thoroughly documented how these services benefit motorists who use TBTA facilities. *See id.*

Plaintiffs also argue that it is unreasonable for TBTA toll-payers to bear the cost of reduced traffic when all drivers in the region, even those who do not use the bridges and tunnels, reap the benefits.  A similar objection could be made with respect to the economic and cultural benefits, which benefit TBTA toll-payers and non-customers alike.  However, the fact that some of the benefits that flow from the bridges and tunnels are available not only to TBTA customers but to all those who drive or access the City's economic and cultural offerings is not itself evidence that TBTA members did not benefit reasonably from their use of the bridges and tunnels.  The benefits that flow to non-customers do not diminish the benefits received by those who pay the TBTA tolls. *See Janes*, 977 F. Supp. 2d at 342.  Plaintiffs' remaining arguments are without merit.

Accordingly, the Court finds that Defendants' toll policies satisfy the excessiveness prong of the *Northwest Airlines* test.  Therefore, Defendants' motion for summary judgment on the right to travel and dormant Commerce Clause claims is GRANTED.

III.    <u>State Claims</u>

Plaintiffs assert related common-law claims under New York law for unjust enrichment

and money had and received in connection with the allegedly unconstitutional tolls charged by Defendants.  Under New York law, "[t]o prevail on a claim of unjust enrichment, a Plaintiff must establish (1) that the defendant benefitted; (2) at the Plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks omitted).  To state a claim for money had and received, a plaintiff must demonstrate that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons, Ltd., v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984); *see also Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 498 (S.D.N.Y. 2005).

Plaintiffs allege that Defendants "charged tolls, or caused the charging of tolls, to Plaintiffs . . . in an amount that Defendants were not legally entitled to, and by doing so Defendants collected or received money belonging to Plaintiffs . . . to which Defendants were not entitled."  Compl. ¶ 133.  To establish a claim for either unjust enrichment or money had and received, Plaintiffs must show some underlying reason in equity or good conscience that Defendants are not entitled to the tolls charged.  Plaintiffs did not address their state law claims in their opposition and reply papers.  Because Plaintiffs have failed to establish that Defendants' tolls were unconstitutional or unlawful, summary judgment for Defendants is appropriate.  *See Janes*, 2013 WL 5630629, at *20 ("[B]oth the unjust enrichment and money had and received claims are premised on a finding that the practices are unconstitutional or unlawful.").

Accordingly, Defendants' motion for summary judgment on Plaintiffs' state law claims is GRANTED.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.  Plaintiffs' cross-motion is DENIED.  The Clerk of Court is instructed terminate the motions at ECF Nos. 58 and 75 and close the case.

SO ORDERED.

Dated: September 16, 2014
       New York, New York

_____
ANALISA TORRES
United States District Judge